# COMMUNICATIONS WORKERS OF AMERICA ET AL. *v.* BECK ET AL.

No. 86–637.   Argued January 11, 1988—Decided June 29, 1988

BRENNAN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, and STEVENS, JJ., joined, and in Parts I and II of which BLACKMUN, O'CONNOR, and SCALIA, JJ., joined. BLACK-MUN, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR and SCALIA, JJ., joined, *post*, p. 763. KENNEDY, J., took no part in the consideration or decision of the case.

*Laurence Gold* argued the cause for petitioners. With him on the briefs were *Thomas S. Adair, James Coppess*, and *George Kaufmann*.

*Edwin Vieira, Jr.*, argued the cause for respondents. With him on the brief was *Hugh L. Reilly*.*

JUSTICE BRENNAN delivered the opinion of the Court.

Section 8(a)(3) of the National Labor Relations Act of 1935 (NLRA), 49 Stat. 452, as amended, 29 U. S. C. § 158(a)(3), permits an employer and an exclusive bargaining representative to enter into an agreement requiring all employees in the bargaining unit to pay periodic union dues and initiation fees as a condition of continued employment, whether or not the employees otherwise wish to become union members. Today we must decide whether this provision also permits a union, over the objections of dues-paying nonmember employees, to expend funds so collected on activities unrelated to collective bargaining, contract administration, or grievance adjustment, and, if so, whether such expenditures violate the union's duty of fair representation or the objecting employees' First Amendment rights.

---

*David M. Silberman* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Landmark Legal Foundation by *Jerald L. Hill* and *Mark J. Bredemeier*; for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun* and *Anthony T. Caso*; and for Senator Jesse Helms et al. by *Thomas A. Farr, W. W. Taylor, Jr.*, and *Robert A. Valois*.

*Solicitor General Fried, Deputy Solicitor General Cohen, Norton J. Come*, and *Linda Sher* filed a brief for the United States as *amicus curiae*.

## I

In accordance with § 9 of the NLRA, 49 Stat. 453, as amended, 29 U. S. C. § 159, a majority of the employees of American Telephone and Telegraph Company and several of its subsidiaries selected petitioner Communications Workers of America (CWA) as their exclusive bargaining representative. As such, the union is empowered to bargain collectively with the employer on behalf of all employees in the bargaining unit over wages, hours, and other terms and conditions of employment, § 9(a), 29 U. S. C. § 159(a), and it accordingly enjoys "broad authority . . . in the negotiation and administration of [the] collective bargaining contract." *Humphrey* v. *Moore*, 375 U. S. 335, 342 (1964). This broad authority, however, is tempered by the union's "statutory obligation to serve the interests of all members without hostility or discrimination toward any," *Vaca* v. *Sipes*, 386 U. S. 171, 177 (1967), a duty that extends not only to the negotiation of the collective-bargaining agreement itself but also to the subsequent enforcement of that agreement, including the administration of any grievance procedure the agreement may establish. *Ibid.* CWA chartered several local unions, copetitioners in this case, to assist it in discharging these statutory duties. In addition, at least in part to help defray the considerable costs it incurs in performing these tasks, CWA negotiated a union-security clause in the collective-bargaining agreement under which all represented employees, including those who do not wish to become union members, must pay the union "agency fees" in "amounts equal to the periodic dues" paid by union members. Plaintiffs' Complaint ¶ 11 and Plaintiffs' Exhibit A–1, 1 Record. Under the clause, failure to tender the required fee may be grounds for discharge.

In June 1976, respondents, 20 employees who chose not to become union members, initiated this suit challenging CWA's use of their agency fees for purposes other than collective bargaining, contract administration, or grievance adjustment

(hereinafter "collective-bargaining" or "representational" activities). Specifically, respondents alleged that the union's expenditure of their fees on activities such as organizing the employees of other employers, lobbying for labor legislation, and participating in social, charitable, and political events violated petitioners' duty of fair representation, § 8(a)(3) of the NLRA, the First Amendment, and various common-law fiduciary duties. In addition to declaratory relief, respondents sought an injunction barring petitioners from exacting fees above those necessary to finance collective-bargaining activities, as well as damages for the past collection of such excess fees.

The District Court concluded that the union's collection and disbursement of agency fees for purposes other than bargaining unit representation violated the associational and free speech rights of objecting nonmembers, and therefore enjoined their future collection. 468 F. Supp. 93 (Md. 1979). Applying a "clear and convincing" evidentiary standard, the District Court concluded that the union had failed to show that more than 21% of its funds were expended on collective-bargaining matters. App. to Pet. for Cert. 119a. The court ordered reimbursement of all excess fees respondents had paid since January 1976, and directed the union to institute a recordkeeping system to segregate accounts for representational and noncollective-bargaining activities. *Id.*, at 125a, 108a–109a.

A divided panel of the United States Court of Appeals for the Fourth Circuit agreed that respondents stated a valid claim for relief under the First Amendment, but, preferring to rest its judgment on a ground other than the Constitution, concluded that the collection of nonmembers' fees for purposes unrelated to collective bargaining violated § 8(a)(3). 776 F. 2d 1187 (1985). Turning to the specific activities challenged, the majority noted that the District Court's adoption of a "clear and convincing" standard of proof was improper, but found that for certain categories of expenditures, such

as lobbying, organizing employees in other companies, and funding various community services, the error was harmless inasmuch as the activities were indisputably unrelated to bargaining unit representation. The majority remanded the case for reconsideration of the remaining expenditures, which the union claimed were made in connection with valid collective-bargaining activities. Chief Judge Winter dissented. *Id.*, at 1214. He concluded that § 8(a)(3) authorized exaction of fees in amounts equivalent to full union dues, including fees expended on nonrepresentational activities, and that the negotiation and enforcement of agreements permitting such exactions was private conduct incapable of violating the constitutional rights of objecting nonmembers.

On rehearing, the en banc court vacated the panel opinion and by a 6-to-4 vote again affirmed in part, reversed in part, and remanded for further proceedings. 800 F. 2d 1280 (1986). The court explained in a brief *per curiam* opinion that five of the six majority judges believed there was federal jurisdiction over both the § 8(a)(3) and the duty-of-fair-representation claims, and that respondents were entitled to judgment on both. Judge Murnaghan, casting the deciding vote, concluded that the court had jurisdiction over only the duty-of-fair-representation claim; although he believed that § 8(a)(3) permits union-security clauses requiring payment of full union dues, he concluded that the collection of such fees from nonmembers to finance activities unrelated to collective bargaining violates the union's duty of fair representation. All six of these judges agreed with the panel's resolution of the specific allocations issue and accordingly remanded the action. Chief Judge Winter, joined by three others, again dissented for the reasons set out in his earlier panel dissent.

The decision below directly conflicts with that of the United States Court of Appeals for the Second Circuit. See *Price* v. *Auto Workers*, 795 F. 2d 1128 (1986). We granted certiorari to resolve the important question concerning the

validity of such agreements, 482 U. S. 904 (1987), and now affirm.

## II

At the outset, we address briefly the jurisdictional question that divided the Court of Appeals. Respondents sought relief on three separate federal claims: that the exaction of fees beyond those necessary to finance collective-bargaining activities violates § 8(a)(3); that such exactions violate the judicially created duty of fair representation; and that such exactions violate respondents' First Amendment rights. We think it clear that the courts below properly exercised jurisdiction over the latter two claims, but that the National Labor Relations Board (NLRB or Board) had primary jurisdiction over respondents' § 8(a)(3) claim.

In *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236 (1959), we held that "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States *as well as the federal courts* must defer to the exclusive competence of the [Board] if the danger of state interference with national policy is to be averted." *Id.*, at 245 (emphasis added). A simple recitation of respondents' § 8(a)(3) claim reveals that it falls squarely within the primary jurisdiction of the Board: respondents contend that, by collecting and using agency fees for nonrepresentational purposes, the union has contravened the express terms of § 8(a)(3), which, respondents argue, provides a limited authorization for the collection of only those fees necessary to finance collective-bargaining activities. There can be no doubt, therefore, that the challenged fee-collecting activity is "subject to" § 8.

While the five-judge plurality of the en banc court did not explain the basis of its jurisdictional holding, the panel majority concluded that because courts have jurisdiction over challenges to union-security clauses negotiated under § 2, Eleventh of the Railway Labor Act (RLA), 64 Stat. 1238, 45 U. S. C. § 152, Eleventh, which is in all material respects identical to § 8(a)(3), there must be a parity of federal juris-

diction over § 8(a)(3) claims. Unlike the NLRA, however, the RLA establishes no agency charged with administering its provisions, and instead leaves it to the courts to determine the validity of activities challenged under the Act. The primary jurisdiction of the NLRB, therefore, cannot be diminished by analogies to the RLA, for in this regard the two labor statutes do not parallel one another. The Court of Appeals erred, then, to the extent that it concluded it possessed jurisdiction to pass directly on respondents' § 8(a)(3) claim.

The court was not precluded, however, from deciding the merits of this claim insofar as such a decision was necessary to the disposition of respondents' duty-of-fair-representation challenge. Federal courts may resolve unfair labor practice questions that "emerge as collateral issues in suits brought under independent federal remedies," *Connell Construction Co.* v. *Plumbers*, 421 U. S. 616, 626 (1975), and one such remedy over which federal jurisdiction is well settled is the judicially implied duty of fair representation. *Vaca* v. *Sipes*, 386 U. S. 171 (1967). This jurisdiction to adjudicate fair-representation claims encompasses challenges leveled not only at a union's contract administration and enforcement efforts, *id.*, at 176–188, but at its negotiation activities as well. *Ford Motor Co.* v. *Huffman*, 345 U. S. 330 (1953). Employees, of course, may not circumvent the primary jurisdiction of the NLRB simply by casting statutory claims as violations of the union's duty of fair representation. Respondents, however, have done no such thing here; rather, they claim that the union failed to represent their interests fairly and without hostility by negotiating and enforcing an agreement that allows the exaction of funds for purposes that do not serve their interests and in some cases are contrary to their personal beliefs. The necessity of deciding the scope of § 8(a)(3) arises because *petitioners* seek to defend themselves on the ground that the statute authorizes precisely this type of agreement. Under these circumstances, the Court of Ap-

peals had jurisdiction to decide the § 8(a)(3) question raised by respondents' duty-of-fair-representation claim.[1]

### III

Added as part of the Labor Management Relations Act, 1947, or Taft-Hartley Act, § 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization." 29 U. S. C. § 158 (a)(3). The section contains two provisos without which all union-security clauses would fall within this otherwise broad condemnation: the first states that nothing in the Act "preclude[s] an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein" 30 days after the employee attains employment, *ibid.;* the second, limiting the first, provides:

"[N]o employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure . . . to tender the periodic

---

[1] The courts below, of course, possessed jurisdiction over respondents' constitutional challenges. Whether or not the NLRB entertains constitutional claims, see *Florida Gulf Coast Building & Construction Trades Council (Edward J. DeBartolo Corp.)*, 273 N. L. R. B. 1431, 1432 (1985) (Board "will presume the constitutionality of the Act [it] administer[s]"); *Handy Andy, Inc.*, 228 N. L. R. B. 447, 452 (1977) (Board lacks the authority "to determine the constitutionality of mandatory language in the Act"); see also *Johnson* v. *Robison*, 415 U. S. 361, 368 (1974) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies"); cf. *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 495–499 (1979) (reviewing Board's history of determining its jurisdiction over religious schools in light of Free Exercise Clause concerns), such claims would not fall within the Board's primary jurisdiction.

dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." *Ibid.*

Taken as a whole, § 8(a)(3) permits an employer and a union[2] to enter into an agreement requiring all employees to become union members as a condition of continued employment, but the "membership" that may be so required has been "whittled down to its financial core." *NLRB* v. *General Motors Corp.*, 373 U. S. 734, 742 (1963). The statutory question presented in this case, then, is whether this "financial core" includes the obligation to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment. We think it does not.

Although we have never before delineated the precise limits § 8(a)(3) places on the negotiation and enforcement of union-security agreements, the question the parties proffer is not an entirely new one. Over a quarter century ago we held that § 2, Eleventh of the RLA does not permit a union, over the objections of nonmembers, to expend compelled agency fees on political causes. *Machinists* v. *Street*, 367 U. S. 740 (1961). Because the NLRA and RLA differ in certain crucial respects, we have frequently warned that decisions construing the latter often provide only the roughest of guidance when interpreting the former. See, *e. g.*, *Street, supra*, at 743; *First National Maintenance Corp.* v. *NLRB*, 452 U. S. 666, 686, n. 23 (1984). Our decision in *Street*, however, is far more than merely instructive here: we believe it is controlling, for § 8(a)(3) and § 2, Eleventh are in all material respects identical.[3] Indeed, we have previously described

---

[2] Section 8(b)(2) makes it unlawful for unions "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3)," 29 U. S. C. § 158(b)(2); accordingly, the provisos to § 8(a)(3) also allow unions to seek and enter into union-security agreements.

[3] Section 2, Eleventh provides, in pertinent part:

"Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or

the two provisions as "statutory equivalent[s]," *Ellis* v. *Railway Clerks*, 466 U. S. 435, 452, n. 13 (1984), and with good reason, because their nearly identical language reflects the fact that in both Congress authorized compulsory unionism only to the extent necessary to ensure that those who enjoy union-negotiated benefits contribute to their cost. Thus, in amending the RLA in 1951, Congress expressly modeled § 2, Eleventh on § 8(a)(3), which it had added to the NLRA only four years earlier, and repeatedly emphasized that it was extending "to railroad labor the same rights and privileges of the union shop that are contained in the Taft-Hartley Act." 96 Cong. Rec. 17055 (1951) (remarks of Rep. Brown).[4] In

---

labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted —

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership." 45 U. S. C. § 152, Eleventh.

Although § 2, Eleventh allows termination of an employee for failure to pay "periodic dues, initiation fees, *and assessments (not including fines and penalties),*" the italicized language was added to the RLA only because some railway unions required only nominal dues, and financed their bargaining activities through monthly assessments; having added "assessments" as a proper element of agency fees, Congress simply clarified that the term did not refer, as it often did in the parlance of other industries, to fines or penalties. See *Machinists* v. *Street*, 367 U. S., at 766. In addition, § 2, Eleventh pre-empts state laws that would otherwise ban union shops. This difference, however, has no bearing on the types of union-security agreements that the statute permits, and thus does not distinguish the union shop authorization of § 2, Eleventh from that of § 8(a)(3).

[4] See also S. Rep. No. 2262, 81st Cong., 2d Sess., 3 (1950) ("[T]he terms of [the bill] are substantially the same as those of the Labor-Management

these circumstances, we think it clear that Congress intended the same language to have the same meaning in both statutes.

## A

Both the structure and purpose of § 8(a)(3) are best understood in light of the statute's historical origins. Prior to the enactment of the Taft-Hartley Act of 1947, 61 Stat. 140, § 8(3) of the Wagner Act of 1935 (NLRA) permitted majority unions to negotiate "closed shop" agreements requiring employers to hire only persons who were already union members.

Relations Act"); H. R. Rep. No. 2811, 81st Cong., 2d Sess., 4 (1950) (the bill allows unions "to negotiate agreements with railroads and airlines of a character permitted in the case of labor organizations in the other large industries of the country"); 96 Cong. Rec. 15737 (1950) (remarks of Sen. Hill) ("The bill . . . is designed merely to extend to employees and employers subject to the [RLA] rights now possessed by employees and employers under the Taft-Hartley Act"); *id.*, at 15740 (remarks of Sen. Lehman) ("The railroad brotherhoods should have the same right that any other union has to negotiate for the union shop"); *id.*, at 16267 (remarks of Sen. Taft) ("[T]he bill inserts in the railway mediation law almost the exact provisions . . . of the Taft-Hartley law"); *id.*, at 17049 (remarks of Rep. Beckworth) (the bill permits railway unions "to bring about agreements with carriers providing for union shops, a principle enacted into law in the Taft-Hartley bill"); *id.*, at 17055 (remarks of Rep. Biemiller) ("[The] provision . . . gives to railway labor the right to bargain for the union shop just as any other labor group in the country may do"); *id.*, at 17056 (remarks of Rep. Bennett) ("The purpose of the bill is to amend the [RLA] to give railroad workers . . . the same right to enjoy the benefits and privileges of a union-shop arrangement that is now accorded to all workmen in most other types of employment"); *ibid.* (remarks of Rep. Heselton) ("[T]his bill primarily provides for the same kind of treatment of railroad and airline employees as is now accorded employees in all other industries under existing law"); *id.*, at 17059 (remarks of Rep. Harris) ("The fundamental proposition involved in the bill [is to extend] the national policy expressed in the Taft-Hartley Act regarding the lawfulness of . . . the union shop . . . to . . . railroad and airline labor organizations"); *id.*, at 17061 (remarks of Rep. Vursell) ("This bill simply extends to the railroad workers and employers the benefit of this provision now enjoyed by all other laboring men under the Taft-Hartley Act").

See *Algoma Plywood Co.* v. *Wisconsin Employment Relations Board,* 336 U. S. 301, 307–311 (1949). By 1947, such agreements had come under increasing attack, and after extensive hearings Congress determined that the closed shop and the abuses associated with it "create[d] too great a barrier to free employment to be longer tolerated." S. Rep. No. 105, 80th Cong., 1st Sess., 6 (1947) (S. Rep.), Legislative History of Labor Management Relations Act, 1947 (Committee Print compiled for the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare), p. 412 (1974) (Leg. Hist.). The 1947 Congress was equally concerned, however, that without such agreements, many employees would reap the benefits that unions negotiated on their behalf without in any way contributing financial support to those efforts. As Senator Taft, one of the authors of the 1947 legislation, explained, "the argument . . . against abolishing the closed shop . . . is that if there is not a closed shop those not in the union will get a free ride, that the union does the work, gets the wages raised, then the man who does not pay dues rides along freely without any expense to himself." 93 Cong. Rec. 4887 (1947), Leg. Hist. 1422.[5] Thus, the Taft-Hartley Act was

---

[5] This sentiment was repeated throughout the hearings and lengthy debate that preceded passage of the bill. See, *e. g.,* 93 Cong. Rec. 3557 (1947), Leg. Hist. 740 (remarks of Rep. Jennings) (because members of the minority "would get the benefit of that contract made between the majority of their fellow workmen and the management . . . it is not unreasonable that they should go along and contribute dues like the others"); 93 Cong Rec. 3558, Leg. Hist. 741 (remarks of Rep. Robison) ("If [union-negotiated] benefits come to the workers all alike, is it not only fair that the beneficiaries, whether the majority or the minority, contribute their equal share in securing these benefits?"); 93 Cong. Rec. 3837, Leg. Hist. 1010 (remarks of Sen. Taft) ([T]he legislation, "in effect, . . . say[s], that no one can get a free ride in such a shop. That meets one of the arguments for a union shop. The employee has to pay the union dues"); S. Rep., at 6, Leg. Hist. 412 ("In testifying before this Committee, . . . leaders of organized labor have stressed the fact that in the absence of [union-security] provisions many employees sharing the benefits of what unions are able to ac-

"intended to accomplish twin purposes. On the one hand, the most serious abuses of compulsory unionism were eliminated by abolishing the closed shop. On the other hand, Congress recognized that in the absence of a union-security provision 'many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.'" *NLRB* v. *General Motors Corp.*, 373 U. S., at 740–741 (quoting S. Rep., at 6, Leg. Hist. 412).

The legislative solution embodied in § 8(a)(3) allows employers to enter into agreements requiring all the employees in a given bargaining unit to become members 30 days after being hired as long as such membership is available to all workers on a nondiscriminatory basis, but it prohibits the mandatory discharge of an employee who is expelled from the union for any reason other than his or her failure to pay initiation fees or dues. As we have previously observed, Congress carefully tailored this solution to the evils at which it was aimed:

"Th[e] legislative history clearly indicates that Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees. Thus Congress recognized the validity of unions' concerns about 'free riders,' *i. e.*, employees who receive the benefits of union representation but are unwilling to contribute their *fair share* of financial support to such union, and gave unions the power to contract to meet *that problem* while withholding from unions the power to cause the discharge of employees for any other reason." *Radio Officers* v. *NLRB*, 347 U. S. 17, 41 (1954) (emphasis added).

---

complish by collective bargaining will refuse to pay their share of the cost"). See also H. R. Rep. No. 245, 80th Cong., 1st Sess., 80 (1947) (H. R. Rep.), Leg. Hist. 371 ("[Closed shop] agreements prevent nonunion workers from sharing in the benefits resulting from union activities without also sharing in the obligations").

Indeed, "Congress' decision to allow union-security agreements *at all* reflects its concern that . . . the parties to a collective bargaining agreement be allowed to provide that there be no employees who are getting the benefits of union representation without paying for them." *Oil Workers* v. *Mobil Oil Corp.*, 426 U. S. 407, 416 (1976) (emphasis added).

This same concern over the resentment spawned by "free riders" in the railroad industry prompted Congress, four years after the passage of the Taft-Hartley Act, to amend the RLA. As the House Report explained, 75 to 80% of the 1.2 million railroad industry workers belonged to one or another of the railway unions. H. R. Rep. No. 2811, 81st Cong., 2d Sess., 4 (1950). These unions, of course, were legally obligated to represent the interests of all workers, including those who did not become members; thus nonunion workers were able, at no expense to themselves, to share in all the benefits the unions obtained through collective bargaining. *Ibid.* Noting that the "principle of authorizing agreements for the union shop and the deduction of union dues has now become firmly established as a national policy for all industry subject to the Labor Management Relations Act of 1947," the House Report concluded that "[n]o sound reason exists for continuing to deny to labor organizations subject to the Railway Labor Act the right to negotiate agreements with railroads and airlines of a character permitted in the case of labor organizations in the other large industries of the country." *Ibid.*

In drafting what was to become § 2, Eleventh, Congress did not look to § 8(a)(3) merely for guidance. Rather, as Senator Taft argued in support of the legislation, the amendment "inserts in the railway mediation law almost the exact provisions, so far as they fit, of the Taft-Hartley law, so that the conditions regarding the union shop and the check-off are carried into the relations between railroad unions and the rail-

roads." 96 Cong. Rec. 16267 (1950)." This was the universal understanding, among both supporters and opponents, of the purpose and effect of the amendment. See n. 4, *supra.* Indeed, railroad union representatives themselves proposed the amendment that incorporated in § 2, Eleventh, § 8(a)(3)'s prohibition against the discharge of employees who fail to obtain or maintain union membership for any reason other than nonpayment of periodic dues; in offering this proposal the unions argued, in terms echoing the language of the Senate Report accompanying the Taft-Hartley Act, that such a prohibition "remedies the alleged abuses of compulsory union membership . . . , yet makes possible the elimination of the 'free rider' and the sharing of the burden of maintenance by all of the beneficiaries of union activity." Hearings on H. R. 7789 before the House Committee on Interstate and Foreign Commerce, 81st Cong., 2d Sess., 253 (1950).

In *Street* we concluded "that § 2, Eleventh contemplated compulsory unionism to force employees to share the costs of negotiating and administering collective agreements, and the costs of the adjustment and settlement of disputes," but that Congress did not intend "to provide the unions with a means for forcing employees, over their objection, to support political causes which they oppose." 367 U. S., at 764. Constru-

---

"Although Senator Taft qualified his comparison by explaining that the provisions of the Taft-Hartley law were incorporated into the RLA "so far as they fit," this qualification merely reflected the fact that the laws were not identical in all respects, their chief difference inhering in their preemptive effect, or lack thereof, on all state regulation of union-security agreements. See n. 3, *supra.* This difference, of course, does not detract from the near identity of the provisions insofar as they confer on unions and employers authority to enter into union-security agreements, nor does it in any way undermine the force of Senator Taft's comparison with respect to this authority. Indeed, Taft himself explained that he initially "objected to some of the original terms of the bill, but when the [bill's] proponents agreed to accept amendments which made the provisions *identical* with the Taft-Hartley law," he decided to support the law. 96 Cong. Rec. 16267 (1950) (emphasis added).

ing the statute in light of this legislative history and purpose, we held that although § 2, Eleventh on its face authorizes the collection from nonmembers of "periodic dues, initiation fees, and assessments . . . *uniformly required* as a condition of acquiring or retaining membership" in a union, 45 U. S. C. § 152, Eleventh (b) (emphasis added), this authorization did not "ves[t] the unions with unlimited power to spend exacted money." 367 U. S., at 768. We have since reaffirmed that "Congress' essential justification for authorizing the union shop" limits the expenditures that may properly be charged to nonmembers under § 2, Eleventh to those "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive [bargaining] representative." *Ellis* v. *Railway Clerks*, 466 U. S., at 447–448. Given the parallel purpose, structure, and language of § 8(a)(3), we must interpret that provision in the same manner.[7] Like § 2, Eleventh,

---

[7] We note that the NLRB, at least for a time, also took the position that the uniform "periodic dues and initiation fees" required by § 8(a)(3) were limited by the congressional concern with free riders to those fees necessary to finance collective-bargaining activities. In *Teamsters Local No. 959*, 167 N. L. R. B. 1042, 1045 (1967), the Board explained:

"[T]he right to charge 'periodic dues' granted unions by the proviso to Section 8(a)(3) is concerned exclusively with the concept that those enjoying the benefits of collective bargaining should bear their fair share of the costs incurred by the collective-bargaining agent in representing them. But it is manifest that dues that do not contribute, and are not intended to contribute, to the cost of operation of a union in its capacity as collective-bargaining agent cannot be justified as necessary for the elimination of 'free riders.'"

The Board, however, subsequently repudiated that view. See *Detroit Mailers Union No. 40*, 192 N. L. R. B. 951, 952 (1971).

Notwithstanding this unequivocal language, the dissent advises us, *post*, at 767, n. 5, that we have misread *Teamsters Local*. Choosing to ignore the above-quoted passage, the dissent asserts that the Board never "embraced . . . the view," *post*, at 767, n. 5, that "periodic dues and initiation fees" are limited to those that finance the union in its capacity as collective-bargaining agent, because in *Teamsters Local* itself the Board concluded that the dues in question "were actually 'special purpose funds,'" and were thus "'assessments' not contemplated by the proviso to § 8(a)(3)." *Post*, at 767, n. 5

§ 8(a)(3) permits the collection of "periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership" in the union,[8] and like its counterpart in the RLA, § 8(a)(3) was designed to remedy the inequities posed by "free riders" who would otherwise unfairly profit from the

(quoting *Teamsters Local*, *supra*, at 1044). This observation, however, avails the dissent nothing; obviously, once the Board determined that the dues were not used for collective-bargaining purposes, the conclusion that they were not dues within the meaning of § 8(a)(3) followed automatically. Under the dissent's reading, had the union simply built the increase into its dues base, rather than initially denominating it as a "special assessment," it would have been entitled to exact the fees as "periodic dues" and spend them for precisely the same purposes without running afoul of § 8(a)(3). The Board made entirely clear, however, that it was the *purpose* of the fee, not the manner in which it was collected, that controlled, and thus explained that "[m]onies collected for a credit union or building fund even if regularly recurring, as here, are obviously not 'for the maintenance of the' [union] as an organization, but are for a 'special purpose' and could be terminated without affecting *the continued existence of [the union] as the bargaining representative*." *Teamsters Local*, *supra*, at 1045 (emphasis added). Finally, the dissent's portrayal of *Teamsters Local* as part of an unbroken string of consistent Board decisions on the issue is belied by the dissenting statement in *Detroit Mailers*, in which member Jenkins, who joined the decision in *Teamsters Local*, charged that the Board had ignored the clear holding of that earlier case. 192 N. L. R. B., at 952–953.

[8] Construing both § 8(a)(3) and § 2, Eleventh as permitting the collection and use of only those fees germane to collective bargaining does not, as petitioners seem to believe, read the term "uniform" out of the statutes. The uniformity requirement makes clear that the costs of representational activities must be borne equally by all those who benefit; without this language, unions could conceivably establish different dues rates both among members and between members and nonmembers, and thereby apportion the costs of collective bargaining unevenly. Indeed, the uniformity requirement inures to the benefit of dissident union members as well, by ensuring that if the union discriminates against them by charging higher dues, their failure to pay such dues cannot be grounds for discharge. See § 8(b)(2), 29 U. S. C. § 158(b)(2) (making it an unfair labor practice for a union "to cause or attempt to cause an *employer* to discriminate against an employee . . . with respect to whom membership in [the union] has been denied or terminated on some ground other than [the] failure to tender the periodic dues and initiation fees uniformly required") (emphasis added).

Taft-Hartley Act's abolition of the closed shop.  In the face of such statutory congruity, only the most compelling evidence could persuade us that Congress intended the nearly identical language of these two provisions to have different meanings.  Petitioners have not proffered such evidence here.

B

(1)

Petitioners claim that the union-security provisions of the RLA and NLRA can and should be read differently in light of the vastly different history of unionism in the industries the two statutes regulate.  Thus they note that in *Street* we emphasized the "long-standing tradition of voluntary unionism" in the railway industry prior to the 1951 amendment, and the fact that in 1934 Congress had expressly endorsed an "open shop" policy in the RLA.  367 U. S., at 750.  It was this historical background, petitioners contend, that led us to conclude that in amending the RLA in 1951, Congress "did not completely abandon the policy of full freedom of choice embodied in the 1934 Act, but rather made inroads on it for the limited purpose of eliminating the problems created by the 'free rider.'"  *Id.*, at 767.  The history of union security in industries governed by the NLRA was precisely the opposite: under the Wagner Act of 1935, all forms of compulsory unionism, including the closed shop, were permitted.  Petitioners accordingly argue that the inroads Congress made in 1947 on the policy of compulsory unionism were likewise limited, and were designed to remedy only those "carefully-defined" abuses of the union shop system that Congress had expressly identified.  Brief for Petitioners 42.  Because agreements requiring the payment of uniform dues were not among these specified abuses, petitioners contend that § 8(a)(3) cannot plausibly be read to prohibit the collection of fees in excess of those necessary to cover the costs of collective bargaining.

We find this argument unpersuasive for several reasons. To begin with, the fact that Congress sought to remedy "the most serious abuses of compulsory union membership," S. Rep., at 7, Leg. Hist. 413, hardly suggests that the Taft-Hartley Act effected only limited changes in union-security practices. Quite to the contrary, in *Street* we concluded that Congress' purpose in amending the RLA was "limited" precisely because Congress did not perceive voluntary unionism as the source of widespread and flagrant abuses, and thus modified the railroad industry's open shop system only to the extent necessary to eliminate the problems associated with "free riders." That Congress viewed the Wagner Act's regime of compulsory unionism as seriously flawed, on the other hand, indicates that its purposes in overhauling that system were, if anything, far less limited, and not, as petitioners and the dissent contend, equally circumspect. Not surprisingly, therefore—and in stark contrast to petitioners' "limited inroads" theory—congressional opponents of the Taft-Hartley Act's union-security provisions understood the Act to provide only the most grudging authorization of such agreements, permitting "union-shop agreement[s] only under limited and administratively burdensome conditions." S. Rep., pt. 2, p. 8, Leg. Hist. 470 (Minority Report). That understanding comports with our own recognition that "Congress' decision to allow union-security agreements *at all* reflects its concern that . . . the parties to a collective bargaining agreement be allowed to provide that there be no employees who are getting the benefits of union representation without paying for them." *Oil Workers* v. *Mobil Oil Corp.*, 426 U. S., at 416 (emphasis added). Congress thus did not set out in 1947 simply to tinker in some limited fashion with the NLRA's authorization of union-security agreements. Rather, to the extent Congress preserved the status quo, it did so because of the considerable evidence adduced at congressional hearings indicating that "such agreements promoted stability by eliminating 'free riders,'" S. Rep., at 7,

Leg. Hist. 413, and Congress accordingly "gave unions the power to contract to meet *that problem* while withholding from unions the power to cause the discharge of employees for any other reason." *Radio Officers* v. *NLRB*, 347 U. S., at 41 (emphasis added). We therefore think it not only permissible but altogether proper to read § 8(a)(3), as we read § 2, Eleventh, in light of this animating principle.

Finally, however much union-security practices may have differed between the railway and NLRA-governed industries prior to 1951, it is abundantly clear that Congress itself understood its actions in 1947 and 1951 to have placed these respective industries on an equal footing insofar as compulsory unionism was concerned. Not only did the 1951 proponents of the union shop propose adding to the RLA language nearly identical to that of § 8(a)(3), they repeatedly insisted that the purpose of the amendment was to confer on railway unions precisely the same right to negotiate and enter into union-security agreements that all unions subject to the NLRA enjoyed. See n. 4, *supra*. Indeed, a subtheme running throughout the comments of these supporters was that the inequity of permitting "free riders" in the railroad industry was especially egregious in view of the fact that the Taft-Hartley Act gave exclusive bargaining representatives in all other industries adequate means to redress such problems. It would surely come as a surprise to these legislators to learn that their efforts to provide these same means of redress to railway unions were frustrated by the very historical disparity they sought to eliminate.

(2)

Petitioners also rely on certain aspects of the Taft-Hartley Act's legislative history as evidence that Congress intended to permit the collection and use of full union dues, including those allocable to activities other than collective bargaining. Again, however, we find this history insufficient to compel a

broader construction of § 8(a)(3) than that accorded § 2, Eleventh in *Street*.

First and foremost, petitioners point to the fact that Congress expressly considered proposals regulating union finances but ultimately placed only a few limitations on the collection and use of dues and fees, and otherwise left unions free to arrange their financial affairs as they saw fit. In light of this history and the specific prohibitions Congress did enact, petitioners argue that there is no warrant for implying any further limitations on the amount of dues equivalents that unions may collect or the manner in which they may use them. As originally passed, § 7(b) of the House bill guaranteed union members the "right to be free from unreasonable or discriminatory financial demands of" unions. Leg. Hist. 176. Similarly, § 8(c) of the bill, the so-called "bill of rights for union members," H. R. Rep., at 31, Leg. Hist. 322, set out 10 protections against arbitrary action by union officers, one of which made it an unfair labor practice for a union to impose initiation fees in excess of $25 without NLRB approval, or to fix dues in amounts that were unreasonable, nonuniform, or not approved by majority vote of the members. *Id.*, at 53. In addition, § 304 of the bill prohibited unions from making contributions to or expenditures on behalf of candidates for federal office. *Id.*, at 97–98. The conferees adopted the latter provision, see *Pipefitters* v. *United States*, 407 U. S. 385, 405 (1972), and agreed to a prohibition on "excessive" initiation fees, see § 8(b)(5), 29 U. S. C. § 158(b)(5), but the Senate steadfastly resisted any further attempts to regulate internal union affairs. Referring to the House provisions, Senator Taft explained:

> "[T]he Senate conferees refused to agree to the inclusion of this subsection in the conference agreement since they felt that it was unwise to authorize an agency of the Government to undertake such elaborate policing of the internal affairs of unions as this section contemplated . . . .
> In the opinion of the Senate conferees the language

which protected an employee from losing his job if a union expelled him for some reason other than nonpayment of dues and initiation fees, uniformly required of all members, was considered sufficient protection." 93 Cong. Rec. 6443 (1947), Leg. Hist. 1540.

Petitioners would have us infer from the demise of this "bill of rights" that Congress "'rejected . . . general federal restrictions on either the dues equivalents that employees may be required to pay or the uses to which unions may put such dues-equivalents,'" and that aside from the prohibition on political expenditures Congress placed no limitations on union exactions other than the requirement that they be equal to uniform dues. Brief for Petitioners 39–40 (quoting Brief for United States as *Amicus Curiae* 19). We believe petitioners' reliance on this legislative compromise is misplaced. The House bill did not purport to set out the rights of *nonmembers* who are compelled to pay union dues, but rather sought to establish a "bill of rights for union *members*" vis-à-vis their union leaders. H. R. Rep., at 31, Leg. Hist. 322 (emphasis added). Thus, §8(c) of the House bill sought to regulate, among other things, the ability of unions to fine, discipline, suspend, or expel members; the manner in which unions conduct certain elections or maintain financial records; and the extent to which they can compel contributions to insurance or other benefit plans, or encumber the rights of members to resign. Leg. Hist. 52–56. The debate over these provisions focused on the desirability of Government oversight of internal union affairs, and a myriad of reasons having nothing whatever to do with the rights of nonmembers accounted for Congress' decision to forgo such detailed regulation. In rejecting any limitation on dues, therefore, Congress was not concerned with restrictions on "dues-equivalents," but rather with the administrative burdens and

potential threat to individual liberties posed by Government regulation of purely internal union matters.[9]

It simply does not follow from this that Congress left unions free to exact dues equivalents from nonmembers in any amount they please, no matter how unrelated those fees may be to collective-bargaining activities. On the contrary, the complete lack of congressional concern for the rights of nonmembers in the debate surrounding the House "bill of rights" is perfectly consistent with the view that Congress understood § 8(a)(3) to afford nonmembers adequate protection by authorizing the collection of only those fees necessary to finance collective-bargaining activities: because the amount of such fees would be fixed by their underlying purpose—defraying the costs of collective bargaining—Congress would have every reason to believe that the lack of any limitations on union dues was entirely irrelevant so far as the rights of nonmembers were concerned. In short, we think it far safer and far more appropriate to construe § 8(a)(3) in light of its legislative justification, i. e., ensuring that nonmembers who obtain the benefits of union representation can be made to pay for them, than by drawing inferences from Congress' rejection of a proposal that did not address the rights of nonmembers at all.

Petitioners also deem it highly significant that prior to 1947 unions "'rather typically'" used their members' dues for a "'variety of purposes . . . in addition to meeting the . . . costs of collective bargaining,'" *Retail Clerks* v. *Schermerhorn*, 373 U. S. 746, 754 (1963), and yet Congress, which was presumably well aware of the practice, in no way limited the

---

[9] See, e. g., H. R. Rep., at 76–77, Leg. Hist. 367–368 (Minority Views) (charging that Government regulation was essentially impossible; that the encroachment on the rights of voluntary organizations such as unions was "without parallel"; and that such regulation invited harassment by rival unions and employers, and ultimately complete governmental control over union affairs).

uses to which unions could put fees collected from nonmembers. This silence, petitioners suggest, should be understood as congressional acquiescence in these practices. The short answer to this argument is that Congress was equally well aware of the same practices by railway unions, see *Street*, 367 U. S., at 767 ("We may assume that Congress was . . . fully conversant with the long history of intensive involvement of the railroad unions in political activities"); *Ellis*, 466 U. S., at 446 ("Congress was adequately informed about the broad scope of union activities"), yet neither in *Street* nor in any of the cases that followed it have we deemed Congress' failure in § 2, Eleventh to prohibit or otherwise regulate such expenditures as an endorsement of fee collections unrelated to collective-bargaining expenses. We see no reason to give greater weight to Congress' silence in the NLRA than we did in the RLA, particularly where such silence is again perfectly consistent with the rationale underlying § 8(a)(3): prohibiting the collection of fees that are not germane to representational activities would have been redundant if Congress understood § 8(a)(3) simply to enable unions to charge nonmembers only for those activities that actually benefit them.

Finally, petitioners rely on a statement Senator Taft made during floor debate in which he explained how the provisos of § 8(a)(3) remedied the abuses of the closed shop. "The great difference [between the closed shop and the union shop]," the Senator stated, "is that [under the union shop] a man can get a job without joining the union or asking favors of the union. . . . The fact that the employee has to pay dues to the union seems to me to be much less important." 93 Cong. Rec. 4886 (1947), Leg. Hist. 1422. On its face, the statement—made during a lengthy legislative debate—is somewhat ambiguous, for the reference to "union dues" could connote "full union dues" or could as easily be a shorthand method of referring to "collective-bargaining-related dues." In any event, as noted above, Senator Taft later described § 2, Eleventh as "almost the exact provisions . . . of the Taft-Hartley law," 96 Cong.

Rec. 16267 (1950), and we have construed the latter statute as permitting the exaction of only those dues related to representational activities. In view of Senator Taft's own comparison of the two statutory provisions, his comment in 1947 fails to persuade us that Congress intended virtually identical language in two statutes to have different meanings.

(3)

We come then to petitioners' final reason for distinguishing *Street.* Five years prior to our decision in that case, we ruled in *Railway Employees* v. *Hanson*, 351 U. S. 225 (1956), that because the RLA pre-empts all state laws banning union-security agreements, the negotiation and enforcement of such provisions in railroad industry contracts involves "governmental action" and is therefore subject to constitutional limitations. Accordingly, in *Street* we interpreted § 2, Eleventh to avoid the serious constitutional question that would otherwise be raised by a construction permitting unions to expend governmentally compelled fees on political causes that nonmembers find objectionable. See 367 U. S., at 749. No such constitutional questions lurk here, petitioners contend, for § 14(b) of the NLRA expressly preserves the authority of States to outlaw union-security agreements. Thus, petitioners' argument runs, the federal pre-emption essential to *Hanson*'s finding of governmental action is missing in the NLRA context, and we therefore need not strain to avoid the plain meaning of § 8(a)(3) as we did with § 2, Eleventh.

We need not decide whether the exercise of rights permitted, though not compelled, by § 8(a)(3) involves state action. Cf. *Steelworkers* v. *Sadlowski*, 457 U. S. 102, 121, n. 16 (1982) (union's decision to adopt an internal rule governing its elections does not involve state action); *Steelworkers* v. *Weber*, 443 U. S. 193, 200 (1979) (negotiation of collective-bargaining agreement's affirmative-action plan does not involve state action). Even assuming that it does not, and

that the NLRA and RLA therefore differ in this respect, we do not believe that the absence of any constitutional concerns in this case would warrant reading the nearly identical language of § 8(a)(3) and § 2, Eleventh differently. It is, of course, true that federal statutes are to be construed so as to avoid serious doubts as to their constitutionality, and that when faced with such doubts the Court will first determine whether it is fairly possible to interpret the statute in a manner that renders it constitutionally valid. *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council,* 485 U. S. 568 (1988); *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932). But statutory construction may not be pressed " 'to the point of disingenuous evasion,' " *United States* v. *Locke,* 471 U. S. 84, 96 (1985) (quoting *George Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933)), and in avoiding constitutional questions the Court may not embrace a construction that "is plainly contrary to the intent of Congress." *DeBartolo, supra,* at 575. In *Street,* we concluded that our interpretation of § 2, Eleventh was "not only 'fairly possible' but entirely reasonable," 367 U. S., at 750, and we have adhered to that interpretation since. We therefore decline to construe the language of § 8(a)(3) differently from that of § 2, Eleventh on the theory that our construction of the latter provision was merely constitutionally expedient. Congress enacted the two provisions for the same purpose, eliminating "free riders," and that purpose dictates our construction of § 8(a)(3) no less than it did that of § 2, Eleventh, regardless of whether the negotiation of union-security agreements under the NLRA partakes of governmental action.

## IV

We conclude that § 8(a)(3), like its statutory equivalent, § 2, Eleventh of the RLA, authorizes the exaction of only those fees and dues necessary to "performing the duties of an exclusive representative of the employees in dealing with the

employer on labor-management issues." *Ellis*, 466 U. S., at 448. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BLACKMUN, with whom JUSTICE O'CONNOR and JUSTICE SCALIA join, concurring in part and dissenting in part.

I agree that the District Court and the Court of Appeals properly exercised jurisdiction over respondents' duty-of-fair-representation and First Amendment claims, and that the National Labor Relations Board had primary jurisdiction over respondents' claim brought under § 8(a)(3) of the National Labor Relations Act of 1935, 49 Stat. 452, as amended, 29 U. S. C. § 158(a)(3). I also agree that the Court of Appeals had jurisdiction to decide the § 8(a)(3) question raised by respondents' duty-of-fair-representation claim.[1] I therefore join Parts I and II of the Court's opinion.

My agreement with the majority ends there, however, for I cannot agree with its resolution of the § 8(a)(3) issue. Without the decision in *Machinists* v. *Street*, 367 U. S. 740 (1961), involving the Railway Labor Act (RLA), the Court could not reach the result it does today. Our accepted mode of resolving statutory questions would not lead to a construction of § 8(a)(3) so foreign to that section's express language and legislative history, which show that Congress did not intend to limit either the amount of "agency fees" (or what the majority labels "dues-equivalents") a union may collect under a union-security agreement, or the union's expenditure of such funds. The Court's excessive reliance on *Street* to reach a

---

[1] Like the majority, I do not reach the First Amendment issue raised below by respondents, and therefore similarly do not address whether a union's exercise of rights pursuant to § 8(a)(3) involves state action. See *ante*, at 761.

contrary conclusion is manifested by its unique line of reasoning. No sooner is the language of § 8(a)(3) intoned, than the Court abandons all attempt at construction of *this* statute and leaps to its interpretation over a quarter century ago of another statute enacted by a different Congress, a statute with a distinct history and purpose. See *ante*, at 744–745. I am unwilling to offend our established doctrines of statutory construction and strain the meaning of the language used by Congress in § 8(a)(3), simply to conform § 8(a)(3)'s construction to the Court's interpretation of similar language in a different later-enacted statute, an interpretation which is itself "not without its difficulties." *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 232 (1977) (characterizing the Court's decision in *Street*). I therefore dissent from Parts III and IV of the Court's opinion.

## I

As the Court observes, "we have never before delineated the precise limits § 8(a)(3) places on the negotiation and enforcement of union-security agreements." *Ante*, at 745. Unlike the majority, however, I think the issue is an entirely new one. I shall endeavor, therefore, to resolve it in accordance with our well-settled principles of statutory construction.

## A

As with any question of statutory interpretation, the starting point is the language of the statute itself. Section 8(a)(3) makes it unlawful for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U. S. C. § 158(a)(3). Standing alone, this proscription, and thus § 8(b)(2)'s corollary proscription,[2] effectively would outlaw union-security agreements. The proscription, however, is qualified by two provisos. The first, which appeared initially in § 8(a)(3) of the

---

[2] Section 8(b)(2) makes it unlawful for a union "to cause or attempt to cause an employer" to violate § 8(a)(3). 29 U. S. C. § 158(b)(2).

NLRA as originally enacted in 1935, 49 Stat. 452, generally excludes union-security agreements from statutory condemnation by explaining that

> "nothing in [the NLRA] or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein . . . if such labor organization is the representative of the employees as provided in section 159(a) of this title . . . ." § 8(a)(3), 29 U. S. C. § 158(a)(3).

The second proviso, incorporated in § 8(a)(3) by the Taft-Hartley Amendments of 1947, 61 Stat. 141,[3] circumscribes the first proviso's general exemption by the following limitations:

> "[N]o employer shall justify any discrimination against an employee for nonmembership in a labor organization . . . if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

The plain language of these statutory provisions, read together, permits an employer and union to enter into an agreement requiring *all* employees, as a condition of continued employment, to pay uniform periodic dues and initiation fees.[4] The second proviso expressly allows an employer to terminate any "employee," pursuant to a union-security agreement permitted by the first proviso, if the employee

---

[3] The Taft-Hartley Act also amended the first proviso to prohibit the application of a union-security agreement to an individual until he has been employed for 30 days. See 29 U. S. C. § 158(a)(3).

[4] This reading, of course, flows from the fact that "membership" as used in the first proviso, means not *actual* membership in the union, but rather "the payment of initiation fees and monthly dues." *NLRB* v. *General Motors Corp.*, 373 U. S. 734, 742 (1963).

fails "to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership" in the union. 29 U. S. C. § 158(a)(3). The term "employee," as statutorily defined, includes any employee, without regard to union membership. See 29 U. S. C. § 152 (3). Union-member employees and nonunion-member employees are treated alike under § 8(a)(3).

"[W]e assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 68 (1982), quoting *Richards* v. *United States*, 369 U. S. 1, 9 (1962). The terms "dues" and "fees," as used in the proviso, can refer to nothing other than the regular, periodic dues and initiation fees paid by "voluntary" union members. This was the apparent understanding of the Court in those decisions in which it held that § 8(a)(3) permits union-security agreements. See *NLRB* v. *General Motors Corp.*, 373 U. S. 734, 736 (1963) (approving a union-security proposal that would have conditioned employment "upon the payment of sums equal to the initiation fee and regular monthly dues paid by the union members"); *Retail Clerks* v. *Schermerhorn*, 373 U. S. 746, 753 (1963) (upholding agreement requiring nonmembers to pay a "service fee [which] is admittedly the exact equal of membership initiation fees and monthly dues"). It also has been the consistent view of the NLRB,[5] "the agency en-

---

[5] See, *e. g.*, *In re Union Starch & Refining Co.*, 87 N. L. R. B. 779, (1949), enf'd, 186 F. 2d 1008 (CA7), cert. denied, 342 U. S. 815 (1951); *Detroit Mailers Union No. 40*, 192 N. L. R. B. 951, 951–952 (1971). In *Detroit Mailers*, the Board explained:

"Neither on its face nor in the congressional purpose behind [§ 8(a)(3)] can any warrant be found for making any distinction here between dues which may be allocated for collective-bargaining purposes and those earmarked for institutional expenses of the union. . . . '[D]ues collected from members may be used for a variety of purposes, in addition to meeting the union's costs of collective bargaining.' Unions 'rather typically' use their membership dues 'to do those things which the members authorized the union to do in their interest and on their behalf.' By virtue of Sec-

trusted by Congress with the authority to administer the NLRA." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 574 (1988). The provisos do not give any employee, union member or not, the right to pay less than the full amount of regular dues and initiation fees charged to all other bargaining-unit employees.

---

tion 8(a)(3)', such dues may be required from an employee under a union-security contract so long as they are periodic and uniformly required and are not devoted to a purpose which would make their mandatory extraction otherwise inimical to public policy." *Id.*, at 952, quoting *Retail Clerks* v. *Schermerhorn*, 373 U. S., at 753–754 (internal quotations omitted).

The United States, appearing here as *amicus curiae*, maintains that position in this case.

Contrary to the Court's suggestion, the NLRB has not embraced and then "repudiated" the view that, for purposes of § 8(a)(3), "periodic dues and initiation fees" mean only "those fees necessary to finance collective-bargaining activities." *Ante*, at 752, n. 7. *Teamsters Local No. 959*, 167 N. L. R. B. 1042 (1967), does not demonstrate otherwise. In *Teamsters Local*, the NLRB held that "working dues" designated to fund a union building program and a credit union were actually "assessments" not contemplated by the proviso to § 8(a)(3). *Id.*, at 1044. The Board found that the union itself regarded the levy as a "temporary assessment," clearly distinct from its "regular dues." *Ibid.* Moreover, because the financing for the programs was constructed in such a way that the union treasury might never have received 90% of the moneys, the Board concluded that the "working dues" were actually "special purposes funds," and that "the support of such funds cannot come from 'periodic dues' as that term is used in § 8(a)(3)." *Ibid.* In *Detroit Mailers*, the NLRB distinguished such assessments from "periodic and uniformly required" dues, which, in its view, a union is not precluded from demanding of nonmembers pursuant to § 8(a)(3). 192 N. L. R. B., at 952.

While the majority credits an interpretation of *Teamsters Local* propounded by a dissenting member of the Board in *Detroit Mailers*, *ante*, at 752–753, n. 7, I prefer to take the Board's word at face value: *Teamsters Local* did not create "controlling precedent" endorsing the view of § 8(a)(3) enunciated by the Court today. 192 N. L. R. B., at 952. Significantly, the majority cannot cite one case in which the Board has held that uniformly required, periodic dues used for purposes other than "collective bargaining" are not dues within the meaning of § 8(a)(3).

The Court's conclusion that § 8(a)(3) prohibits petitioners from requiring respondents to pay fees for purposes other than those "germane" to collective bargaining, contract administration, and grievance adjustment simply cannot be derived from the plain language of the statute. In effect, the Court accepts respondents' contention that the words "dues" and "fees," as used in § 8(a)(3), refer not to the periodic amount a union charges its members but to the portion of that amount that the union expends on statutory collective bargaining.[6] See Brief for Respondents 17–20. Not only is this reading implausible as a matter of simple English usage, but it is also contradicted by the decisions of this Court and of the NLRB interpreting the section. Section 8(a)(3) does not speak of "dues" and "fees" that employees covered by a

---

[6] The Court's insistence that it has not changed the meaning of the term "uniform," see *ante*, at 753, n. 8, misses the point. The uniformity requirement obviously requires that the union can collect from nonmembers under a union-security agreement only those "periodic dues and initiation fees" collected equally from its members. But this begs the question: what "periodic dues and initiation fees"? It is the meaning of those terms which the Court misconceives.

Under our settled doctrines of statutory construction, were there any ambiguity in the meaning of § 8(a)(3) — which there is not — the Court would be constrained to defer to the interpretation of the NLRB, unless the agency's construction were contrary to the clear intent of Congress. *Chevron U. S. A. Inc. v. National Resources Defense Council, Inc.*, 467 U. S. 837, 842–843, and n. 9 (1984). Although the Court apparently finds such ambiguity, it fails to apply this doctrine. By reference to a narrow view of congressional "purpose" gleaned from isolated statements in the legislative history, and in reliance upon this Court's interpretation of another statute, the Court constructs an interpretation that not only finds no support in the statutory language or legislative history of § 8(a)(3), but also contradicts the Board's settled interpretation of the statutory provision. The Court previously has directed: "Where the Board's construction of the Act is reasonable, it should not be rejected 'merely because the courts might prefer another view of the statute.'" *Pattern Makers v. NLRB*, 473 U. S. 95, 114 (1985), quoting *Ford Motor Co. v. NLRB*, 441 U. S. 488, 497 (1979). Here, the only apparent motivation for holding that the Board's interpretation of § 8(a)(3) is impermissible, is the Court's view of *another* statute.

union-security agreement may be required to tender to their union representative; rather, the section speaks only of "the periodic dues and the initiation fees *uniformly required as a condition of acquiring or retaining membership*" (emphasis added). Thus, the section, by its terms, defines "periodic dues" and "initiation fees" as those dues and fees "uniformly required" of all members, not as a portion of full dues. As recognized by this Court, "dues collected from members may be used for a variety of purposes, in addition to meeting the union's costs of collective bargaining. Unions rather typically use their membership dues to do those things which the members authorize the union to do in their interest and on their behalf." *Retail Clerks* v. *Schermerhorn*, 373 U. S., at 753–754 (internal quotations omitted). By virtue of § 8(a)(3), such dues may be required from *any* employee under a union-security agreement. Nothing in § 8(a)(3) limits, or even addresses, the purposes to which a union may devote the moneys collected pursuant to such an agreement.[7]

## B

The Court's attempt to squeeze support from the legislative history for its reading of congressional intent contrary to the plain language of § 8(a)(3) is unavailing. As its own discussion of the relevant legislative materials reveals, *ante*, at 747–750, there is no indication that the 1947 Congress intended to limit the union's authority to collect from nonmembers the same periodic dues and initiation fees it collects from members. Indeed, on balance, the legislative history rein-

---

[7] The Court's answer to the absolute lack of evidence that Congress intended to regulate such expenditures is no answer at all: the Court simply reiterates that in *Machinists* v. *Street*, 367 U. S. 740 (1961), it did not give weight to congressional silence in the RLA on this issue. See *ante*, at 760. The point, however, is *not* that the Court should give weight to Congress' silence in the NLRA; the point is that the Court must find *some* support in the NLRA for its proposition. Congress' silence simply highlights that there is no support for the Court's interpretation of the 1947 Congress' intent.

forces what the statutory language suggests: the provisos neither limit the uses to which agency fees may be put nor require nonmembers to be charged less than the "uniform" dues and initiation fees.

In *Machinists* v. *NLRB*, 362 U. S. 411 (1960), the Court stated:

> "It is well known, and the legislative history of the 1947 Taft-Hartley amendments plainly shows, that § 8(a)(3) — including its proviso — represented the Congressional response to the competing demands of employee freedom of choice and union security. Had Congress thought one or the other overriding, it would doubtless have found words adequate to express that judgment. It did not do so; it accommodated both interests, doubtless in a manner unsatisfactory to the extreme partisans of each, by drawing a line it thought reasonable. It is not for the administrators of the Congressional mandate to approach either side of that line grudgingly." *Id.*, at 418, n. 7.

The legislative debates surrounding the adoption of § 8 (a)(3) in 1947, show that in crafting the proviso to § 8(a)(3), Congress was attempting "only to 'remedy the most serious abuses of compulsory union membership . . . . '" *NLRB* v. *General Motors Corp.*, 373 U. S., at 741, quoting from the legislative history. The particular "abuses" Congress identified and attempted to correct were two: the closed shop, which "deprives management of any real choice of the men it hires" and gives union leaders "a method of depriving employees of their jobs, and in some cases [of] a means of securing a livelihood in their trade or calling, for purely capricious reasons," S. Rep. No. 105, 80th Cong., 1st Sess., 6 (1947) (S. Rep.), Legislative History of the Labor Management Relations Act, 1947 (Committee Print compiled for the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare), p. 412 (1974) (Leg. Hist.); and those union shops in which the union sought to obtain indirectly the same

result as that obtained through a closed shop by negotiating a union-shop agreement and maintaining a "closed" union where it was free to deny membership to an individual arbitrarily or discriminatorily and then compel the discharge of that person because of his nonmembership, 93 Cong. Rec. 3836–3837, 4193, 4885–4886 (1947), Leg. Hist. 1010, 1096–1097, 1420–1421 (remarks of Sen. Taft); 93 Cong. Rec. 4135, Leg. Hist. 1061–1062 (remarks of Sen. Ellender). Senator Taft, the chief sponsor of the Senate bill, in arguing against an amendment to proscribe all forms of union-security agreements, stated that it was unwise to outlaw union-security agreements altogether "since there had been for such a long time so many union shops in the United States, [and] since in many trades it was entirely customary and had worked satisfactorily," and that therefore the appropriate approach was to "meet the problem of dealing with the abuses which had appeared." 93 Cong. Rec. 4885, Leg. Hist. 1420.[8] "Con-

---

[8] See also, *e. g.*, 93 Cong. Rec. 3837 (1947), Leg. Hist. 1010 (remarks of Sen. Taft) ("[B]ecause the union shop has been in force in many industries for so many years . . . to upset it today probably would destroy relationships of long standing and probably would bring on more strikes than it would cure").

Despite a legislative history rife with unequivocal statements to the contrary, the Court concludes that the 1947 Congress did not set out to restrict union-security agreements in a "limited fashion." *Ante*, at 755. Quite apart from the Court's unorthodox reliance on representations of those *opposed* to the Taft-Hartley amendments, the majority's observation that "Congress viewed the Wagner Act's regime of compulsory unionism as seriously flawed," *ibid.*, begs the question. The perceived flaws were embedded in the *closed*-shop system, not the *union*-shop system. Thus, as is characteristic of the majority's opinion, its comparison to the RLA, under which there was no closed-shop system, is beside the point. See *ibid.* Congress was aware that under the NLRA, "the one system [the closed shop] ha[d] led to very serious abuses and the other system [the union shop] ha[d] not led to such serious abuses." 93 Cong. Rec. 4886 (1947), Leg. Hist. 1421 (remarks of Sen. Taft). Accordingly, Congress banned closed shops altogether, but it made only limited inroads on the union-shop system that had been in effect prior to 1947, carefully describing its limitations on such agreements. H. R. Rep. No. 245, 80th Cong.,

gress [also] recognized that in the absence of a union-security provision 'many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.'" *NLRB* v. *General Motors Corp.*, 373 U. S., at 740–741, quoting S. Rep., at 6, Leg. Hist. 412.

Congress' solution was to ban the closed shop and to permit the enforcement of union-shop agreements as long as union membership is available "on the same terms and conditions" to all employees, and mandatory discharge is required only for "nonpayment of regular dues and initiation fees." S. Rep., at 7, 20, Leg. Hist. 413, 426. Congress was of the view, that, as Senator Taft stated, "[t]he fact that the employee will have to pay dues to the union seems . . . to be much less important. The important thing is that the man will have the job." 93 Cong. Rec. 4886 (1947), Leg. Hist. 1422. "[A] man can get a job with an employer and can continue in that job if, in effect, he joins the union and pays the union dues.

.          .          .          .          .

"If he pays the dues without joining the union, he has the right to be employed." 93 Cong. Rec. 4886 (1947), Leg. Hist.

---

1st Sess., 9 (1947), Leg. Hist. 300; S. Rep., at 6–7, Leg. Hist. 412–413. It could not be clearer from the legislative history that in enacting the provisos to § 8(a)(3), Congress attempted to deal only with specific abuses in the union-shop system, only the "actual problems that ha[d] arisen." 93 Cong. Rec. 4886 (1947), Leg. Hist. 1421 (remarks of Sen. Taft); accord, 93 Cong. Rec. 3836–3837 (1947), Leg. Hist. 1010–1011 (remarks of Sen. Taft). Congress' philosophy was that it had "to decree either an open shop or an open union. [It] decreed an open union . . . [which would] permit the continuation of existing relationships, and [would] not violently tear apart a great many long-existing relationships and make trouble in the labor movement; and yet at the same time it [would] meet the abuses which exist." 93 Cong. Rec. 4886 (1947), Leg. Hist. 1420 (remarks of Sen. Taft). Union-security agreements requiring the payment of uniform periodic dues and standard initiation fees were not among the specified abuses. There was no testimony regarding problems arising from such arrangements. Indeed, the subtext of the entire debate was that such arrangements were acceptable. The Court's suggestion to the contrary is simply untenable.

1421–1422. There is no serious doubt that what Congress had in mind was a situation in which the nonmember employee would "pay the same dues as other members of the union." 93 Cong. Rec. 4272 (1947), Leg. Hist. 1142 (remarks of Sen. Taft); accord, 93 Cong. Rec. 3557 (1947), Leg. Hist. 740 (remarks of Sen. Jennings) (members of the minority "should go along and contribute dues like the others"). In their financial obligations, therefore, these employees were "in effect," union members, and could not be discharged pursuant to a union-security agreement as long as they maintained this aspect of union "membership."[*] This solution was viewed as "tak[ing] care" of the free-rider issue. 93 Cong. Rec. 4887 (1947), Leg. Hist. 1422 (remarks of Sen. Taft).

Throughout the hearings and lengthy debate on one of the most hotly contested issues that confronted the 1947 Congress, not once did any Member of Congress suggest that § 8(a)(3) did not leave employers and unions free to adopt and enforce union-security agreements requiring all employees in the bargaining unit to pay an amount equal to full union dues and standard initiation fees. Nor did anyone suggest that § 8(a)(3) affected a union's expenditure of such funds.

Indeed, the legislative history indicates that Congress affirmatively declined to place limitations on either the amount of dues a union could charge or the uses to which it could put these dues. The Court dismisses as irrelevant the fact that Congress expressly rejected the House proposal that would have empowered the NLRB to regulate the "reasonableness" of union dues and expenditures. The Court finds meaningful the fact that "[t]he House bill did not purport to set out the

---

[*] The Senate Report explained: Congress "did not desire to limit the labor organization with respect to either its selection of membership or expulsion therefrom. But [it] did wish to protect the employee in his job if unreasonably expelled or denied membership. The tests provided by the amendment are based upon facts readily ascertainable and do not require the employer to inquire into the internal affairs of the union." S. Rep., at 20, Leg. Hist. 426.

rights of *nonmembers* who are compelled to pay union dues, but rather sought to establish a 'bill of rights for union *members*' vis-à-vis their union leaders. H. R. Rep., at 31, Leg. Hist. 322 (emphasis added)." *Ante*, at 758. But this is a distinction without a difference. Contrary to the Court's view, Congress viewed this proposal as directly related to § 8(a)(3); Congress clearly saw the nonmembers' interests in this context as being represented by union members.[10] Thus, Senator Taft explained the Senate conferees' reasons for refusing to accept the provisions in the House bill:

> "In the opinion of the Senate conferees[,] the language which protected an employee from losing his job if a union expelled him for some reason other than nonpayment of dues and initiation fees, uniformly required of all members, was considered sufficient protection." 93 Cong. Rec. 6443 (1947), Leg. Hist. 1540.

Congress' decision, in the course of the well-documented Senate-House compromise, not to place any general federal restrictions on the levels or uses of union dues,[11] indicates

---

[10] The Court appears to believe that Congress intended § 8(a)(3) to protect the interests of individual nonmembers in the uses to which the union puts their moneys. See *ante*, at 759. It could not be clearer, however, that Congress did not have this in mind at all. As Senator Taft explained to his colleague who complained that requiring a man to join a union he does not wish to join (pursuant to § 8(a)(3)) was no less restrictive than a closed shop: in enacting § 8(a)(3), Congress was not trying "to go into the broader fields of the rights of particular persons." 93 Cong. Rec. 4886 (1947), Leg. Hist. 1421.

The only "rights" protected by the § 8(a)(3) provisos are workers' employment rights. As the legislative debates reflect, Congress was principally concerned with insulating workers' jobs from capricious actions by union leaders. "The purpose of the union unfair labor practice provisions added to § 8(a)(3) was to 'preven[t] the union from inducing the employer to use the emoluments of the job to enforce the union's rules.'" *Pattern Makers* v. *NLRB*, 473 U. S., at 126 (dissenting opinion), quoting *Scofield* v. *NLRB*, 394 U. S. 423, 429 (1969).

[11] Congress placed only one limitation on the uses which can be made of union dues. "[W]ith little apparent discussion or opposition," the Senate

that it did not intend the provisos to limit the uses to which agency fees may be put.

The Court invokes what it apparently sees as a single-minded legislative purpose, namely, the eradication of a "free-rider" problem, and then views the legislative history through this narrow prism. The legislative materials demonstrate, however, that, contrary to the impression left by the Court, Congress was not guided solely by a desire to eliminate "free riders." The 1947 Congress that carefully crafted § 8(a)(3) was focusing on a quite different problem — the most serious abuses of compulsory unionism. As the majority observes, "Congress carefully tailored [its] solution to the evils at which it was aimed." *Ante*, at 749. In serving its purpose, Congress went only so far in foreclosing compulsory unionism. It outlawed closed shops altogether, but banned unions from using union-security provisions only where those provisions exact more than the initiation fees and "periodic dues" uniformly required as conditions of union

---

conferees adopted the House bill's prohibition limiting what unions may spend from dues money on federal elections. *Pipefitters* v. *United States*, 407 U. S. 385, 405 (1972). In § 304 of the Labor Management Relations (Taft-Hartley) Act, 61 Stat. 159–160, which is now incorporated in the Federal Election Campaign Act of 1976, 90 Stat. 490, 2 U. S. C. § 441b(a), Congress made it unlawful for a union "to make a contribution or expenditure in connection with" certain political elections, primaries, or political conventions.

The Senate conferees also agreed with the House that some safeguard was needed to prevent unions from charging new members exorbitant initiation fees that effectively "close" the union, thereby "frustrat[ing] the intent of [§ 8(a)(3)]." 93 Cong. Rec. 6443 (1947), Leg. Hist. 1540 (remarks of Sen. Taft). Hence, § 8(b)(5) was added to the final bill, which makes it an unfair labor practice for a union which has negotiated a union-security agreement to require initiation fees that the NLRB "finds excessive or discriminatory under all the circumstances." 29 U. S. C. § 158(b)(5). The Senate passed § 8(b)(5) only after receiving assurances from Senator Taft that it would not allow the NLRB to regulate union expenditures. See 93 Cong. Rec. 6859 (1947), Leg. Hist. 1623 (stressing that the provision "is limited to initiation fees and does not cover dues").

membership. Otherwise, it determined that the regulation of union-security agreements should be left to specific federal legislation and to the legislatures and courts of the several States.[12] Congress explicitly declined to mandate the kind of particularized regulation of union dues and fees which the Court attributes to it today.

## II

By suggesting that the 1947 Congress was driven principally by a desire to eradicate a "free-rider" problem, the Court finds the means not only to distort the legislative justification for § 8(a)(3) and to ignore the provision's plain language, but also to draw a controlling parallelism to § 2, Eleventh of the RLA, 64 Stat. 1238, 45 U. S. C. § 152. As mistaken as the Court is in its view of Congress' purpose in enacting § 8(a)(3), the Court is even more mistaken in its reliance on this Court's interpretation of § 2, Eleventh in *Machinists* v. *Street*, 367 U. S. 740 (1961).

The text of § 8(a)(3) of the NLRA is, of course, very much like the text of the later enacted § 2, Eleventh of the RLA. This similarity, however, does not dictate the conclusion that the 1947 Congress intended § 8(a)(3) to have a meaning identical to that which the 1951 Congress intended § 2, Eleventh to have. The Court previously has held that the scope of the RLA is not identical to that of the NLRA and that courts should be wary of drawing parallels between the two stat-

---

[12] "It was never the intention of the [NLRA] . . . to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism." H. R. Conf. Rep. 510, 80th Cong., 1st Sess., 60 (1947), Leg. Hist. 564. Accordingly, Congress added § 14(b) to the final bill, which, as enacted, expressly preserves the authority of the States to regulate union-security agreements, including the use of funds collected from employees pursuant to such an agreement. See *Retail Clerks* v. *Schermerhorn*, 373 U. S., at 751–752. Many States in fact have imposed limitations on the union-security agreements that are permitted in their jurisdictions. See 2 C. Morris, The Developing Labor Law 1391–1392 (2d ed. 1983).

utes.   See, *e. g.*, *First National Maintenance Corp.* v. *NLRB*, 452 U. S. 666, 686, n. 23 (1981); *Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S. 369, 383 (1969). Thus, parallels between § 8(a)(3) and § 2, Eleventh, "like all parallels between the NLRA and the Railway Labor Act, should be drawn with the utmost care and with full awareness of the differences between the statutory schemes." *Chicago & N. W. R. Co.* v. *Transportation Union*, 402 U. S. 570, 579, n. 11 (1971).   Contrary to the majority's conclusion, *ante*, at 750, the two provisions were not born of the "same concern[s]"; indeed, they were born of competing concerns.   This Court's interpretation of § 2, Eleventh, therefore, provides no support for construing § 8(a)(3) in a fashion inconsistent with its plain language and legislative history.[13]

The considerations that enabled the Court to conclude in *Street*, 367 U. S., at 750, that it is "'fairly possible'" and "entirely reasonable" to read § 2, Eleventh to proscribe union-security agreements requiring uniform payments from all bargaining-unit employees are wholly absent with respect to § 8(a)(3).   In *Street*, the Court stressed the fact that from 1926, when the RLA was first enacted, until 1951 when § 2, Eleventh assumed its present form, that Act prohibited all forms of union security and declared a "policy of complete freedom of choice of employees to join or not to join a union." *Ibid.*   By 1951, however, Congress recognized "the expenses and burdens incurred by the unions in the administration of the complex scheme of the [RLA]."   367 U. S., at 751.   The purpose advanced for amending the RLA in 1951 to authorize union-security agreements for the first time was "the elimi-

---

[13] The dissent in the original panel decision in this case appropriately observed: "If the legislative purposes behind § 8(a)(3) and § 2, Eleventh were identical, one would expect that [this] Court in *Street* would have looked to the NLRA for guidance in interpreting § 2, Eleventh.   The *Street* opinion, however, does not significantly rely on or discuss either the NLRA or § 8(a)(3).   Instead, it focuses on the distinctive features of the railroad industry and the Railway Labor Act in construing § 2, Eleventh."   776 F. 2d 1187, 1220 (CA4 1985).

nation of the 'free riders.'" 367 U. S., at 761. Given that background, the Court was persuaded that it was possible to conclude that "Congress did not completely abandon the policy of full freedom of choice embodied in the . . . Act, but rather made inroads on it for the limited purpose of eliminating the problems created by the 'free rider.'" *Id.*, at 767.

The NLRA does not share the RLA's underlying policy, which propelled the Court's interpretation of § 2, Eleventh in *Street.* Indeed, the history of the NLRA points in the opposite direction: the original policy of the Wagner Act was to permit all forms of union-security agreements, and such agreements were commonplace in 1947. Thus, in enacting § 8(a)(3), the 1947 Congress, unlike the 1951 Congress, was not making inroads on a policy of full freedom of choice in order to provide "a specific response," *id.*, at 751, to a particular problem facing unions. Rather, the 1947 amendments to § 8(a)(3) were designed to make an inroad into a preexisting policy of the absolute freedom of private parties under federal law to negotiate union-security agreements. It was a "limited" inroad, responding to carefully defined abuses that Congress concluded had arisen in the union-security agreements permitted by the Wagner Act. The 1947 Congress did not enact § 8(a)(3) for the "same purpose" as did the 1951 Congress in enacting § 2, Eleventh. Therefore, contrary to the Court's conclusion, *ante*, at 762, the latter purpose, "eliminating 'free riders,'" does *not* dictate our construction of § 8(a)(3), regardless of its impact on our construction of § 2, Eleventh.

In order to overcome this inevitable conclusion, the Court relies on remarks made by a few Members of the Congress in enacting the 1951 amendments to § 2, Eleventh of the RLA, which the Court contends show that the 1951 Congress viewed those amendments as identical to the amendments that had been made to § 8(a)(3) of the NLRA in 1947. See *ante*, at 756; see also *ante*, at 746, and n. 4. But even assuming the Court's view of the legislative history of § 2, Elev-

enth is correct (and the legislative materials do not obviously impart the message the Court receives [14]), it does not provide support for the Court's strained reading of § 8(a)(3). Its only possible relevance in this case is to evidence the 1951 Congress' understanding of a statute that particular Congress did not enact. The relevant question here, however, is what the 1947 Congress intended by the statute that *it* enacted. "[I]t is well settled that '"the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."'" *Russello* v. *United States*, 464 U. S. 16, 26 (1983), quoting *Jefferson County Pharmaceutical Assn.* v. *Abbott Laboratories*, 460 U. S. 150, 165, n. 27 (1983), in turn quoting *United States* v. *Price*, 361 U. S. 304, 313 (1960). See also *United States* v. *Clark*, 445 U. S. 23, 33, n. 9 (1980). It

---

[14] The Court overstates the clarity of what was said about § 8(a)(3) when § 2, Eleventh was amended in 1951. As the Court's recitation of various statements reflects, the extent to which the 1951 Congress saw itself engrafting onto the RLA terms *identical*, in all respects, to the terms of § 8(a)(3) is uncertain. See *ante*, at 746–747, n. 4. The remarks are only general comments about the similarity of the NLRA union-security provisions, rather than explicit comparisons of § 8(a)(3) with the provisions of the RLA. For example, Senator Taft explained: "In effect, the bill inserts in the railway mediation law *almost the exact provisions, so far as they fit*, of the Taft-Hartley law, so that the conditions regarding the union shop and the check-off are carried into the relations between railroad unions and the railroads." 96 Cong. Rec. 16267 (1950) (emphasis added). See also, *e. g.*, H. R. Rep. No. 2811, 81st Cong., 2d Sess., 4 (1950) (§ 2, Eleventh allows agreements "of a character" permitted in § 8(a)(3)); 96 Cong. Rec. 17049 (1951) (remarks of Rep. Beckworth) (§ 2, Eleventh extends to railroads "a principle" embodied in § 8(a)(3)). Especially when it is remembered that Congress was *extending* to unions in the railroad industry the authority to enter into agreements for which they previously had *no* authority, whereas the 1947 Congress had rescinded authorization for certain kinds of union-security agreements, the import of these statements is ambiguous. To borrow a phrase from the majority, I "think it far safer and far more appropriate to construe § 8(a)(3) in light of its" language and legislative history, "than by drawing inferences from" ambiguous statements made by Members of a later Congress in enacting a different statute. *Ante*, at 759.

would "surely come as a surprise" to the legislators who enacted § 8(a)(3) to learn that, in discerning their intent, the Court listens not to their voices, but to those of a later Congress. *Ante*, at 756. Unlike the majority, I am unwilling to put the 1951 legislators' words into the 1947 legislators' mouths.

The relevant sources for gleaning the 1947 Congress' intent are the plain language of § 8(a)(3), and, at least to the extent that it might reflect a clear intention contrary to the plain meaning of the statute, the legislative history of § 8(a)(3). Those sources show that the 1947 Congress did not intend § 8(a)(3) to have the same meaning the Court has attributed to § 2, Eleventh of the RLA. I therefore must disagree with the majority's assertion that the Court's decision in *Street* is "controlling" here. See *ante*, at 745.

### III

In sum, I conclude that, in enacting § 8(a)(3) of the NLRA, Congress did not intend to prohibit union-security agreements that require the tender of full union dues and standard union initiation fees from nonmember employees, without regard to how the union expends the funds so collected. In finding controlling weight in this Court's interpretation of § 2, Eleventh of the RLA to reach a contrary conclusion, the Court has not only eschewed our well-established methods of statutory construction, but also interpreted the terms of § 8(a)(3) in a manner inconsistent with the congressional purpose clearly expressed in the statutory language and amply documented in the legislative history. I dissent.