870 F.2d 155
 130 L.R.R.M. (BNA) 2932, 57 USLW 2580,
111 Lab.Cas. P 11,040
 Peter CRAWFORD; Frederick J. Adam; Robert F. Brauman;
Richard L. Brown; William A. Burbage; Robert Erchak; Ron
E. Merzlak; Leroy Rogers; Roger F. Seely; Warren Wells;
Dale Cross; Richard Pederson; Clyde B. Smith; Ernest
Mueller; Ruel Neeley; Robert Buley; Thomas Giefer;
Klemens Thomas; Howard L. Jones; Herbert A. Light; Joseph
R. Mackensie; Michael T. McQuillen; John R. Yotz; Harold
Bagnall; Richard P. Barthelemy; Clinton Davis; Edison L.
Denney; George Gawrilow; John J. Lumley; Albert Newton;
Eugene Palsson; Dale B. Petty; Deryl Roark; Donald D.
Ecker; Karl A. Jadrnicek; Howard S. Morton; Richard W.
Rew; Donovan Wholers; Donald K. Brewster; Peter Hayes;
Laurence J. Stuppy, III; Roger Veon, Plaintiffs-Appellants,
v.
AIR LINE PILOTS ASSOCIATION INTERNATIONAL, Defendant-Appellee,
Transportation Communications International Union, Amicus Curiae.
 No. 88-2083.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1988.
Decided March 17, 1989.
Rehearing In Banc Granted May 11, 1989.
 
 Robert Fisher Gore (Rossie D. Alston, Jr., National Right to Work Legal Defense Foundation, Inc., on brief), for plaintiffs-appellants.
 Jerry David Anker (Gary Green, Air Line Pilots Ass'n, on brief), for defendant-appellee.
 (Mitchell Kraus, Transp. Communications Intern. Union; Marsha S. Berzon, Altshuler & Berzon, on brief) for amicus curiae.
 Before ERVIN, Chief Judge, BUTZNER, Senior Circuit Judge, and MALCOLM J. HOWARD, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 Forty-two nonunion commercial airline pilots appeal a judgment of the district court, entered after a bench trial, in favor of the Air Line Pilots Association, which is a union representing pilots employed by various airlines. The district court held that the Association need not rebate the portion of the pilots' agency fees the Association spent to support strikes at airlines that did not employ the objecting pilots or the portion of the fees that the Association allocated to a contingency fund for support of future strikes. The district court also held that the Association's current procedure for making rebates to the pilots, adopted after the decision of Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), satisfied the requirements explained in that case and that the procedure used before Hudson was decided substantially complied with the requirements. We affirm on both issues.
 
 
 2
 * Section 2 Eleventh of the Railway Labor Act, 45 U.S.C. Sec. 152 Eleventh, which is applicable to airlines, permits employers and unions to execute bargaining agreements requiring employees to become union members. The Supreme Court sustained the constitutionality of section 2 Eleventh under the commerce clause. Railway Employees' Dep't v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). Nevertheless, the Court has consistently held that a union cannot exact funds from a nonmember to spend for purposes that would infringe nonmembers' constitutional rights. In International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Court construed the statute to allow employees to elect not to join the union, or to resign, and to pay agency fees to the union in lieu of dues. In Street and subsequent cases, the Court drew a line between two categories of expenditures, those germane to collective bargaining and those which would infringe a nonmember's rights. It recognized that Congress enacted the statute to eliminate "free-riders--employees in the bargaining unit on whose behalf the union was obliged to perform its statutory functions, but who refused to contribute to the cost thereof." Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, 466 U.S. 435, 447, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984). In Ellis, the Court explained what portion of the nonmembers' agency fees a union could retain and what portion it must rebate. The Court prescribed the following test:
 
 
 3
 ... [W]hen employees such as petitioners object to being burdened with particular union expenditures, the test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employers on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit.
 
 
 4
 466 U.S. at 448, 104 S.Ct. at 1892.
 
 
 5
 The pilots challenge several specific expenditures that the Association classified as germane to collective bargaining and therefore not reimbursable to agency fee-payers. They maintain that expenditures in 1985, 1986, and 1987, in support of strikes at United Airlines and Continental Airlines, and in preparation for a possible strike at Eastern Airlines, should not be charged to agency fee-payers who are not United, Continental, or Eastern employees. They also object to use of their agency fees for the creation and maintenance of a strike reserve fund called the war chest or major contingency fund. The pilots assert that use of agency fees for bargaining expenses outside of the immediate bargaining unit, or airline, for which the fee-payer works, violates both the Railway Labor Act and their constitutionally protected free association rights.
 
 
 6
 If an expenditure is germane to a union's obligation as the employees' representative, the union may charge a proportionate share of that expenditure to agency fee-payers, without offending either the Railway Labor Act or the first amendment. See Ellis, 466 U.S. at 444-47, 104 S.Ct. at 1890-92. As stipulated by the parties, and found as a fact by the district court, the Association is a "unitary national labor organization." It has no locals, and all dues and fees are paid directly to the national union, which negotiates contracts with the various airlines for the pilots of whom it is the exclusive bargaining representative. Bargaining policies are established by its national officers, and all negotiations and agreements must be approved by them. This kind of industry-wide bargaining is neither unique to the airline industry nor novel to the courts. See Childers v. Brotherhood of R.R. Trainmen, 192 F.2d 956, 959 (8th Cir.1951) ("the national organization, not the local lodges, is the collective bargaining representative within the meaning of the Railway Labor Act"). The Railway Labor Act "generally has been considered to absorb and give statutory approval to the philosophy of bargaining as worked out in the labor movement in the United States." Order of R.R. Telegraphers v. Railway Express Agency, 321 U.S. 342, 346, 64 S.Ct. 582, 585, 88 L.Ed. 788 (1944).
 
 
 7
 The district court's findings of fact, which we quote at some length, are essential to an understanding of why the Association's expenditures are germane to collective bargaining with all airlines whose pilots it represents. With respect to the nature of collective bargaining in the airline industry, the court found:
 
 
 8
 [C]ollective bargaining negotiations at any one airline are directly affected by, and also directly affect, negotiations at all other airlines. Each airline strives to keep its labor costs no higher than those of its competitors. Thus, when one airline obtains some cost-cutting concession from [the Association], other airlines generally seek to obtain the same or an equivalent concession. On the other hand, when [the Association] succeeds in negotiating a wage or benefit increase with one airline, that enhances its ability to negotiate a similar increase with other airlines.
 
 
 9
 With respect to the expenditure of funds to support the striking Continental employees, the court found:
 
 
 10
 Consequently, it was important to [the Association], in the interest of all the pilots which it represented, to ensure that what had happened at Continental, namely, a bankruptcy whereby the collective bargaining agreement was abrogated and pilots' salaries were cut in half, not become an industry norm to be sought by other airlines in the bargaining process. For this reason it was in the interest of all pilots, members and non-members alike, that [the Association] used its funds to pay the pilots at Continental to make up for their lost wages.
 
 
 11
 The court also found justification for the Association's refusal to rebate agency fees used along with other union funds to support the strike at United Airlines. It found:[I]n 1985, United sought in bargaining to impose a concession which American Airlines had achieved [with another union], namely, a B-Scale two-tier payment arrangement under which airline cockpit personnel hired after a certain date would be paid on a lower pay scale (the B-Scale). [The Association] supported financially the pilots who struck United, and ultimately, after a twenty-nine day strike, secured from United a six year parity requirement under the B-Scale arrangement. This accomplishment has been used to benefit all members (and non-members) in all the airlines, not just those employed by United.
 
 
 12
 With respect to expenditures for the strike reserve or contingency fund, the court found:
 
 
 13
 The United and Continental strikes considerably weakened [the Association]'s financial stability. Since a financially weak [Association] was vulnerable to a prolonged strike, [the Association] lost its credibility with management because the other airlines knew it could not financially sustain a long strike. For this reason, the Major Contingency Fund was created with a concomitant increase in annual membership dues from 1.35% to 2.35% of each member's airline earnings. It was from this fund that some expenditures, beginning in 1985, were made to support the striking pilots at Continental and United. Plaintiffs attack the fund as an improper expenditure of the dues of the objecting plaintiffs. Again the court finds the creation of the fund to be a device reasonably employed to implement the duties of the union as exclusive representative of the employees in the bargaining unit.
 
 
 14
 Moreover, after the Association reached a favorable strike settlement with United, it was able to negotiate similar agreements with other airlines. The district court's findings that all of these strike-related expenditures were germane accord with the policy underlying charging agency fee-payers for germane expenses "to ensure that those who enjoy union-negotiated benefits contribute to their cost." Communication Workers v. Beck, --- U.S. ----, 108 S.Ct. 2641, 2649, 101 L.Ed.2d 634 (1988).
 
 
 15
 The objecting pilots have not shown that they did not benefit from the Association's financial support of the strikes at Continental and United or that they will never benefit from the contingency fund. Instead, they argue that Ellis not only defined the criteria for assessing germaneness, but also significantly narrowed the category of union expenses that could permissibly be charged as germane. They assert that the Supreme Court, by referring to "employees in the bargaining unit," 466 U.S. at 448, 104 S.Ct. at 1892; intended to limit the expenses assignable to an agency fee-payer to costs incurred only by his relevant bargaining unit.
 
 
 16
 Ellis does not support the restrictive reading that the objecting pilots assign to it. In Ellis the Court analyzed which types of expenditures could be charged against nonmembers' fees. It did not decide how a national union must allocate the expenditures that are germane to bargaining among the bargaining units it represents. That issue was not presented in Ellis. Nevertheless, the Court's discussion of the types of expenditures that can be charged against nonmembers' fees is instructive. Significantly these expenditures were not limited to individual bargaining units. The Court held that nonmembers' fees could be used to pay their proportional share of the union's national conventions. 466 U.S. at 448-49, 104 S.Ct. at 1892-93. The Court also approved the expenditure of agency fees by the national unions for the purchase of refreshments at union business meetings and occasional social activities. It observed that while these affairs are not central to collective bargaining, they are sufficiently related to it to be charged to all employees. 466 U.S. at 449, 104 S.Ct. at 1893. Another national expenditure not confined to any particular unit was for a monthly magazine. The Court held that the union could charge nonmembers for their share of the costs of publication about activities germane to bargaining, but it could not charge them for the costs of publishing articles about activities for which no contribution could be levied. Again, the distinction the Court drew was between the types of expenditures--not whether the cost should be allocated to the specific unit in which an employee worked. 466 U.S. at 450-51, 104 S.Ct. at 1893-94. The Court also distinguished between litigation involving the negotiations of agreements or settlement of grievances, which can be charged to nonmembers, and litigation that does not involve these subjects, which cannot be charged to nonmembers. 466 U.S. at 453, 104 S.Ct. at 1895. The Court held that organizing expenses, even within the bargaining unit, could not be charged to nonmembers, but this category of expenditures is not an issue here.
 
 
 17
 Applying Ellis to the analogous provision for agency shop contracts under the National Labor Relations Act, this court has recognized that agency fees may be allocated to expenses of both a national union and its locals. See Beck v. Communication Workers, 776 F.2d 1187, 1210-13 (4th Cir.1985), reh'g en banc, 800 F.2d 1280 (4th Cir.1986), aff'd --- U.S. ----, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988).[1] In Beck, we held that a union could not charge agency fee-payers for its political and lobbying expenses, community service and charitable donations, and expenditures in support of strikes by other unions in other industries. See 776 F.2d at 1210-12. We suggested that unions could charge fee-payers for properly documented collective bargaining expenses, as well as for grievance and contract administration expenses. See 776 F.2d at 1212-13.
 
 
 18
 The district court's factual findings about the purpose of the expenditures for strikes and a contingency fund and effect of these expenditures on all units where the Association is the bargaining agent demonstrate that the expenditures satisfy the test Ellis prescribes. They were "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of employees in dealing with the employer in labor-management issues." 466 U.S. at 448, 104 S.Ct. at 1892.
 
 II
 
 19
 Addressing the objecting pilots' claims for refunds of fees they had paid, the district court held that the six-month statute of limitations for actions alleging breach of a union's duty of fair representation barred recovery for all claims arising prior to March 3, 1987. The pilots argue that Virginia's two-year statute of limitations for personal injuries applies because they are asserting a constitutional claim.
 
 
 20
 Regardless which statute of limitations is applied, the pilots' claims are not barred. The statute of limitations began to run, with respect to the 1985 agency fees, on September 11, 1986, the date that the 1985 rebate and rebate report were distributed. The Association does not dispute that the dissenting pilots objected in a timely fashion to the 1985 rebates, in accordance with the Association's rebate objection procedures. The parties then entered arbitration, and the statute of limitations was tolled during the arbitration proceedings. See Zuniga v. United Can Co., 812 F.2d 443, 450 (9th Cir.1987); Galindo v. Stoody Co., 793 F.2d 1502, 1510 (9th Cir.1986) (duty of fair representation claim "tolled while good faith attempts are made to resolve that claim through grievance procedures"); cf. Trent v. Bolger, 837 F.2d 657, 659-60 (4th Cir.1988). The parties then agreed to stay arbitration pending this litigation. This suit was filed on September 3, 1987, within either a six-month or a two-year statute of limitations. The additional claims, based upon 1986 and 1987 agency fees, arose after the commencement of the litigation.
 
 III
 
 21
 In Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Court explained the procedural safeguards required by the First Amendment for " 'preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities.' " 475 U.S. at 302, 106 S.Ct. at 1074. Hudson involved a public employer and public employees. The Association takes the position that the state action, and the consequent applicability of the first amendment, that concerned the Court in Hudson is not involved here because airline transportation is a private industry.
 
 
 22
 The Association acknowledges that in 1956, the Supreme Court held directly to the contrary, ruling that "[t]he enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction." Hanson, 351 U.S. at 232, 76 S.Ct. at 718. The Association contends, however, that recent Supreme Court decisions have called into question whether the definition of state action is so broad as to encompass the kind of private collective bargaining agreements here in issue.[2]
 
 
 23
 We cannot accept the Association's argument. The Supreme Court has not repudiated Hanson. In Ellis, 466 U.S. at 439, 104 S.Ct. at 1887, the Court assumed the continuing validity of Hanson, as it did in Beck, 108 S.Ct. at 2656-57. We therefore conclude that unions with agency shop agreements authorized by the Railway Labor Act must provide agency fee objectors the same procedural safeguards prescribed by Hudson for objectors in the public sector.
 
 IV
 
 24
 In Hudson, the Supreme Court enunciated a three-part constitutional test that must be satisfied by a union plan for the collection of agency fees from nonmembers. These safeguards were intended to ensure that unions operating under agency shop contracts would not "collect from dissenting employees any sums for the support of ideological causes not germane to its duties as collective bargaining agent." Ellis, 466 U.S. at 447, 104 S.Ct. at 1892. The Court specified
 
 
 25
 that the constitutional requirements for the Union's collection of agency fees include an adequate explanation for the basis of the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.
 
 
 26
 Hudson, 475 U.S. at 310, 106 S.Ct. at 1078. An adequate explanation requires verification by an independent auditor. 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. The district court held that the procedure adopted by the Association after Hudson complied with that case's requirements. It held that procedure in effect before Hudson was decided substantially complied.
 
 
 27
 In conformity with Hudson, the Association relies on independently audited financial statements to divide its expenses from the previous year into those that are germane to collective bargaining and those that are not. The report of germane and nongermane expenses is sent to every agency fee-payer by May 31. The district court found that the rebate calculation report of 29 pages for 1986 which was distributed in 1987 gave an adequate explanation of the basis of the fee. This finding is not clearly erroneous.
 
 
 28
 Any pilot who has a complaint about the application of the Association's policies and procedure pertaining to rebates may request that his complaint be submitted to an independent arbitrator. At a pilot's request, the amount in dispute is escrowed pending arbitration. Unless the parties otherwise agree, the selection of the arbitrator and the procedures of arbitration will be governed by the American Arbitration Association rule for impartial arbitration of union fees. The Air Line Pilots Association will pay the fees and expenses of the arbitrator. The plan's provision for arbitration satisfies Hudson.
 
 
 29
 Each year the Association deposits in an interest-bearing escrow account 150 percent of the estimated amount of its rebate obligation. As allowed by Hudson, the Association bases this estimate on the previous years' experience. See 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. It also considers budget projections and any other available information. Experience has shown the escrowed amount to be sufficient. Hudson does not require that 100 percent of the agency fees be escrowed pending rebate. 475 U.S. at 310, 106 S.Ct. at 1078.
 
 
 30
 The Association defends its interest-bearing escrow provision by reliance on Ellis, where the Court held that "advance reduction of dues and/or interest-bearing escrow accounts" are acceptable. 466 U.S. at 444, 104 S.Ct. at 1890. Courts differ over the question whether Hudson now requires advance reduction of agency fees for political and ideological expenditures. Compare Damiano v. Matish, 830 F.2d 1363, 1370 (6th Cir.1987) (advance reduction required) with Andrews v. Education Ass'n of Cheshire, 829 F.2d 335, 338-40 (2d Cir.1987) (escrow sufficient). Hudson, like Ellis, condemns the failure to pay interest on rebates. 475 U.S. at 303-06, 106 S.Ct. at 1074. But Hudson does not expressly or impliedly overrule Ellis with respect to providing an interest-bearing escrow account as an alternative to advance reduction. This court has interpreted Ellis to permit an escrow-and-rebate plan. See Beck, 776 F.2d at 1213-14. Relying on Ellis and Beck, we reject the contention that the Association's plan is deficient because it does not provide for advance reduction of agency fees.
 
 
 31
 Actually, the Association currently operates a hybrid reduction-escrow system. The airlines treat all employees, union and nonunion, uniformly with regard to checkoff. But nonmembers may opt out of checkoff and pay their fees monthly. The Association pays a lump sum rebate with interest when it distributes its Report of Germane and Non-Germane Expenses. In addition, the Association reduces monthly payments of nonmembers who have made a timely request and whose fees are not checked off. The advance reduction is based on the current year's estimated ratio of germane and nongermane expenses. A year-end adjustment is made after the actual ratio is determined. This procedure, we believe, fully satisfies Hudson 's concerns that a union not exact an involuntary loan from a nonmember for nongermane expenditures.
 
 
 32
 The Association's plan in effect for 1985, before Hudson was decided, was designed to comply with Ellis, which was decided in 1984. The Association deposited its estimated obligation for rebates in an interest-bearing escrow account. It furnished a copy of the expenditure report to nonmembers who gave notice that they did not wish to pay any nongermane expenditures, but it did not send the report to other fee-payers. This plan provided for arbitration.
 
 
 33
 We agree with the district court that the plan was sufficient. The eight-page explanation of germane and nongermane expenditures was adequate. No nonmember has shown prejudice because he did not receive the report. Although the report was not circulated as promptly as the present plan envisions and the opportunity to arbitrate was delayed, the district court found that no specific damage to any pilot because of delay has been shown. In fact, when arbitration began, the parties mutually agreed to suspend the proceedings pending the outcome of this case.
 
 
 34
 We agree with the district judge on all issues except the application of the statute of limitations. The district court's ruling about limitations had no effect on the outcome of the case, however, for alternatively the district court properly found no merit to the objections about procedures.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 The rehearing en banc dealt with the issue of federal jurisdiction and the Supreme Court affirmed on that ground. The panel's disposition of the fee-allocation issue was not disturbed by the en banc court. See 800 F.2d at 1282
 
 
 [2]
 The Association relies on Blum v. Yaretsky, 457 U.S. 991, 1002-12, 102 S.Ct. 2777, 2784-90, 73 L.Ed.2d 534 (1982); Rendell-Baker v. Kohn, 457 U.S. 830, 839-43, 102 S.Ct. 2764, 2770-73, 73 L.Ed.2d 418 (1982); United Steelworkers v. Weber, 443 U.S. 193, 200, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979); Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 164-66, 98 S.Ct. 1729, 1737-39, 56 L.Ed.2d 185 (1978); and Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)