Captain Stewart W. BECKETT,
et al., Plaintiffs,

v.

The AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Defendants.

Civ. A. No. 90–1867.

United States District Court,
District of Columbia.

Feb. 14, 1992.

David Thompson Bryant, Nat. Right to Work Legal Defense Foundation, Springfield, Va., for plaintiffs.

Jerry David Anker, Legal Dept., Air Line Pilots Ass'n., Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Now before the Court are the parties' cross motions for summary judgment. The issues raised in the motions have been fully briefed by both parties, and the Court heard extensive oral arguments on December 12, 1991.[1] After carefully considering all pleadings submitted on the outstanding motions as well as the arguments made by counsel at the December 12, 1991 hearing, the Court shall grant the defendant's motion for summary judgment and shall deny the plaintiffs' motion for partial summary judgment for the reasons that follow.

## I. SUMMARY OF THE CASE

Plaintiffs are a group of nonunion pilots employed by Pan American World Airways, Inc. ("Pan Am"). Defendant is the Air Line Pilots Association ("ALPA"), which is a labor organization within the meaning of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–188 (1982) and represents, *inter alia*, all pilots employed by Pan Am, regardless of membership in the union. Pan Am is a common carrier within the meaning of the RLA.

Over the course of time, ALPA has engaged in collective bargaining with Pan Am over the terms and conditions of employment with Pan Am on behalf of the pilots employed by Pan Am. This dispute arose because ALPA determined the nonunion members properly were charged service fees to support a sympathy strike at Eastern Airlines, and ALPA retained certain monies that were otherwise due individual nonunion pilots to cover those service fees when they became delinquent.

The complaint alleges defendant breached its fiduciary duty to the plaintiffs by diverting for defendant's own use money held in trust for the plaintiffs, and that defendant violated Section 2 *Eleventh* of the Railway Labor Act by using the plaintiffs' money to support a sympathy strike against another airline without informing the plaintiffs of their right to object to the assessments against them and by resorting to self-help rather than exhausting its rights under the negotiated union security provision of the contract.

## II. FACTUAL FINDINGS

A. *Union Security Provision.*

The collective bargaining agreement between Pan Am and ALPA contains a union security provision that establishes an agency shop. The agency shop requires Pan Am's pilots to either join ALPA or pay a service fee to ALPA as a condition of employment. Pursuant to this provision, pilots who do not want to join the union are not forced to do so, but in lieu of joining, they must pay an appropriate service fee to cover the costs of representation.

The service fee provision in the contract between Pan Am and ALPA establishes the service fee at "an amount equal to [ALPA's] regular and usual monthly dues, initiation fee, and periodic assessments, including MEC assessments, uniformly required of members." There is also a provision in the contract that states if a pilot is delinquent in paying the service charges,

---

**1.** The Court initially delayed ruling in this case at the plaintiff's suggestion, awaiting a ruling following a rehearing *en banc* in the Fourth Circuit case, *Crawford v. Air Line Pilots Associa-* *tion, International,* 870 F.2d 155 (4th Cir.1989). However, having been notified that the Fourth Circuit has asked for reargument, the Court will delay no longer.

the treasurer shall notify the pilot of his delinquency and the possibility that the pilot would be subject to discharge if he failed to pay, and shall set a deadline date by which payment must be received. Also, if the pilot continues to refuse to pay his assessment, under the contract ALPA may certify in writing to Pan Am that the pilot should be terminated for failure to pay. The contract also contains a protest procedure by which a pilot who is subject to a discharge request can challenge that action.

In December 1987, ALPA revised its procedure for ensuring that nonunion pilots had sufficient information to exercise their right to challenge nongermane expenditures under *Chicago Teachers' Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Ellis v. Brotherhood of Railway, Airline and S.S. Clerks, Freight Handlers, Exp. and Station and Employees,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); and *International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). Under the revised procedures, each nonunion pilot covered by the agency shop provision was to be provided annually a copy of the rebate policy for objecting to financially supporting ALPA activities that are not germane to collective bargaining, and for challenging ALPA's determination of which activities are germane to collective bargaining. Each nonunion pilot was also to be provided with a statement of germane and nongermane expenditures with an explanation of the breakdown. Pilots who object to sharing the cost of nongermane activities receive a rebate of that portion of the service fee. If a pilot disagrees with the classification of germane activities or the calculation of his reduction, he is entitled to request arbitration.

## B. *Strike at Eastern Airlines.*

On March 4, 1989, the International Association of Machinists and Aerospace Workers Union ("IAM") and its subordinate unions began a lawful strike against Eastern Air Lines. The Eastern strike was the result of serious labor disputes that had embroiled Eastern and all its unions from the time Texas Air Corporation, headed by Frank Lorenzo, acquired the airlines in 1986. ALPA subsequently sanctioned a "sympathy" strike by pilots in the Eastern Air Lines pilot bargaining unit. Sometime later, the ALPA Executive Committee and Executive Board adopted a resolution authorizing benefits for striking Eastern Pilots and assessing the ALPA membership to pay for those benefits. The resolution became effective when it was ratified by a majority of the ALPA membership. The membership voted on two separate, additional occasions to continue the benefits and assessments for the sympathy strikers.

In May, 1989 ALPA began mailing notices demanding that the nonunion Pan Am pilots pay the Eastern strike assessments. In late May or early June, 1989 ALPA mailed its 1988 statement of germane and nongermane expenditures to the nonunion pilots. Because the statement referred only to 1988 expenditures, there was no reference to the Eastern strike assessments.

From May 1989 through March 1990, there were eleven Eastern strike assessments ranging from $2400 a month to $1600. ALPA did not notify specifically the nonunion Pan Am pilots of their right to object or challenge the chargeability of the Eastern strike assessments. Although 46 of the 49 plaintiffs named in the original complaint were over 60 days delinquent in the payment of the assessments, ALPA only sent delinquency letters to five of the plaintiffs.

## C. *Fagerland Settlement Monies and the Set-Off.*

Pan Am established a Fixed Benefit Retirement Benefit Plan for Pilots ("A Plan"), which was an employee pension plan covered by ERISA. Because of financial difficulties, on several occasions between 1980 and 1983 Pan Am obtained funding waivers allowing Pan Am to defer the contributions it was required to make to the plan. Then, on August 8, 1984, Pan Am announced that it unilaterally was discontinuing additional accruals of retirement pension credits un-

der the A plan, retroactively to December 31, 1983.

ALPA, through its Pan Am Master Executive Council ("Pan Am MEC"), filed grievances against Pan Am for failing to continue funding the plan and for freezing unilaterally the accrual of retirement credits, alleging that these actions by Pan Am violated Pan Am's obligations under the Railway Labor Act and the collective bargaining contract with ALPA. These grievances were pending until February 28, 1985 when Pan Am and the Pan Am MEC reached an agreement on a new collective bargaining agreement between Pan Am and the pilots. That agreement contained provisions relating to the plaintiff's pension rights and benefits. Specifically, the agreement provided that Pan Am would make a Savings Annuitization Payout to Pan Am pilots who were eligible participants in the A Plan. Under the agreement, Pan Am agreed to pay over a five year period, $35.125 million to eligible Pan Am pilots as determined by ALPA ($7.025 million payments in September 1986, 1987, 1988, 1989, 1990).

Although ALPA and Pan Am both anticipated annual distributions to the pilots from the fund, actual distribution was delayed as a result of litigation by a group of pilots who had been participants in the A Plan but were no longer members of the Pan Am bargaining unit because they had been transferred to United Air Lines. *Fagerland v. Air Line Pilots Association, et al.*, Civ. No. 86–3410 (D.D.C. December 19, 1989). In the *Fagerland* litigation, the transferred pilots were disputing the method ALPA used to determine each pilot's proportionate share of the annual payout. The parties to the *Fagerland* litigation agreed to place the $35.125 million fund into an interest bearing escrow account.

In December, 1989, the parties to the *Fagerland* litigation entered into a settlement agreement and consent decree that provided that the fund would be transferred from the escrow account to an account to be established and administered by ALPA. Generally, the consent decree provided that the *Fagerland* class members were to receive a set sum of the money,

and the remaining funds were to be distributed by ALPA to eligible pilots who were not *Fagerland* class members. Similar procedures were provided for the distribution of the September 1990 payment by Pan Am to ALPA.

Although the *Fagerland* consent decree implied that the $35.125 million fund from the settlement was held by ALPA in trust for distribution, it is not clear that such a relationship precluded a set off of the delinquent fees. The consent decree stated in pertinent part

[a]ny sums paid by Pan Am ... are to be paid directly to ALPA, as trustee and agent for the pilots eligible to receive these funds.... ALPA, as trustee and agent, will distribute these payments to individual pilots [according to the established formula].... The sums remaining from the final Pan Am payment shall be distributed to eligible pilots who are not plaintiff class members pursuant to the instructions of the Pan Am MEC.

Although the plaintiffs argue that this created a trustee relationship, the plaintiffs were not parties to the litigation. On February 20, 1990, the Pan Am MEC passed the following resolution:

BE IT RESOLVED that all PAA pilots who are delinquent in dues, service charge or assessment payments to ALPA or who are in arrears in their arrangement plan status as of February 20, 1990 or who have not applied for an arrangement plan by February 20, 1990 or who retired, including those pilots on Disability Status, with an obligation to ALPA shall receive their full payment minus all the money owed to ALPA in the form of back dues, service charges and/or assessments.

BE IT FURTHER RESOLVED that should a pilot who is currently on an arrangement plan and falls in arrears prior to September 1990, the MEC will take similar appropriate action prior to the final distribution in September 1990.

In March 1990, ALPA mailed the distribution checks to plaintiffs including their share of the distribution minus any alleged delinquency to ALPA as of February 20,

1990. Then, in December 1990, ALPA mailed distribution checks from the final payment to plaintiffs, again reduced as a set off for delinquency. A total of $161,647.26 was withheld from plaintiffs.

## III. DISCUSSION

### A. *Standard, for Summary Judgment.*

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (the court must determine "whether there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."). Having found no genuine issues as to any material fact and having found that the defendant is entitled to judgment as a matter of law, the Court shall grant the defendant's motion for summary judgment and shall deny the plaintiff's cross motion for partial summary judgment.

### B. *ERISA, Breach of Fiduciary Duty, and Conversion Claims.*

Plaintiffs have filed a motion for partial summary judgment alleging that the "unlawful taking" of plaintiffs' funds was a violation of the anti-alienation provision of ERISA, was a breach of fiduciary duty, and constituted conversion.

■ The plaintiff's ERISA claim is not well-founded. ERISA applies only to pension and welfare plans and the settlement funds here were not intended to provide medical, disability or other benefits of the sort listed in the statute or to provide income deferred beyond termination of employment. The mere fact that the payments were made pursuant to the settlement of a dispute relating to a pension plan does not bring them within the coverage of ERISA. *See Freeman v. Jacques Orthopaedic and Joint Implant Surgery Medical Group, Inc.*, 721 F.2d 654, 656 (9th Cir.1983). In fact, plaintiffs' motion for summary judgment relies solely on common law breach of fiduciary duty arguments and does not explain how ERISA applies.

■ Plaintiffs argue that ALPA was holding the plaintiffs' $35.125 million fund in trust by virtue of being the "trustee and agent for the pilots eligible to receive these funds" under the *Fagerland* consent decree. As the trustee, the plaintiffs argue, ALPA had a fiduciary duty to ensure that all of the money was dispersed to the pilots in a timely fashion. Because the ERISA claim is not well-founded, the plaintiff's common law claim for breach of fiduciary duty is not properly before the Court because no pendant jurisdiction exists. However, even if jurisdiction exists over the fiduciary claim, the claim has no merit because the duties of a trustee are defined by the express terms of the instrument creating the trust. Here, the settlement agreement entered into between ALPA and the plaintiffs in the *Fagerland* case created no new rights on behalf of the plaintiffs in this case. Additionally, there were no trust documents drafted. Further, the Court is not satisfied that the terms of the *Fagerland* decree were violated by the defendant. Pursuant to the requirements in the Fagerland decree, the Pan Am MEC determined how the funds should be divided among the eligible pilots and directed the withholding of the delinquent dues, assessments and agency shop fees.

■ The second argument that the plaintiff makes with respect to the "unlawful taking" is that ALPA failed to exhaust its contractual remedies against the pilots for the alleged delinquency. ALPA negotiated an agency shop provision that had detailed and exclusive procedures for enforcement, including a requirement of timely notice of any alleged delinquency with sufficient information and time to cure any deficiencies and notice of possible discharge for failure to cure or file a grievance in a timely fashion. The agreement also provided that if a pilot was discharged and he grieved the discharge he could take the dispute to arbitration. Plaintiffs argue that ALPA made only a token attempt to enforce the agency shop provision against the plaintiffs who

were delinquent in paying the Eastern strike assessment. Although ALPA sent delinquency letters to about five nonunion pilots, ALPA took no other action with respect to those pilots when four of the five failed to pay, and took no action with respect to the other pilots.

Although the Court notes that ALPA failed to follow a procedure provided in the contractual agreement, and instead chose what must have appeared at the time to be the easy way out, the Court is not convinced that ALPA deprived the pilots of any contractual rights by doing so. Although the plaintiffs argue they had a contractual right to present the question of whether the assessment was properly charged to the Pan Am officials and/or to submit the question to arbitration, ALPA had no obligation under the contract to seek discharge of the pilots who refused to pay the service fees or assessments, but had an option to do so. If and only if ALPA exercised that option would a pilot have the opportunity to challenge the dismissal before an arbitrator. ALPA indicates that some 328 pilots were delinquent and had money withheld from their settlement distributions. Under the plaintiffs' theory, ALPA would have had to request discharge of each of those pilots for failure to pay rather than use the procedure it used to collect the money without seeking discharge.

C. *Use of Compulsory Service Fees to Support Sympathy Strike.*

■ The second major issue is whether the Railway Labor Act was intended to sanction compulsory financial support of a union's sympathy strike in support of another union's strike at a different carrier. Plaintiffs argue that it was not and that even if it was, ALPA is precluded from collecting the strike assessments because ALPA failed to provide the nonunion pilots with sufficient information regarding the basis for the strike assessments and methods to challenge the assessments.

As an initial matter, the Court notes that the pilots had available under ALPA's Policies and Procedures Applicable to Agency

Fees, the option to seek arbitration of their claim that the assessments were not properly chargeable. The failure to request arbitration on this issue would normally preclude raising the matter in court. In *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), Justice White, in a concurring opinion stated •

> if the union provides for arbitration and complies with the other requirements specified in our opinion, it should be entitled to insist that the arbitration procedure be exhausted before resorting to the courts.

*Id.* at 311, 106 S.Ct. at 1078. Relying on that language, ALPA argues that the plaintiffs ought not be allowed to litigate their substantive objection to the Eastern strike assessment in court now because they failed to pursue the dispute in arbitration. Although there is some merit to this argument, the Court prefers, when possible, to decide important cases on the merits. Accordingly, because the merits of the case have been fully briefed and argued, the Court shall proceed.

■ It has long been recognized that the Railway Labor Act allows a union and employer to agree to include in their collective bargaining agreement an agency shop provision, and that the agency shop provision does not allow a union to use the money received by nonmembers to contribute to political or ideological causes they oppose expressly. *International Association of Machinists v. Street*, 367 U.S. 740, 766–769, 81 S.Ct. 1784, 1798–1800, 6 L.Ed.2d 1141 (1961). The test to determine whether union expenditures are chargeable to nonunion members of the bargaining unit is

> whether the challenged expenditures are necessarily or reasonably incurred for the purposes of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and dis-

putes but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit.

*Ellis v. Brotherhood of Railway, Airline and S.S. Clerks, Freight Handlers, Exp. and Station and Employees,* 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984). *See also Lehnert v. Ferris Faculty Association,* —— U.S. ——, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). Plaintiffs argue that based upon the application of the *Ellis* test, the assessments for the Eastern sympathy strike are nonchargeable because they have no relationship to the Pan Am pilots bargaining unit or even to the pilot bargaining at Eastern.

The Court's decision is guided largely by the recent Supreme Court decision in *Lehnert v. Ferris Faculty Association,* —— U.S. ——, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). In *Lehnert,* Justice Blackmun, writing for a five-member majority, described a three-pronged test for determining what union expenditures were chargeable to nonunion bargaining unit members. The majority's test only allowed chargeability if the activities were germane to collective bargaining, were justified by the government's interest in labor peace and avoiding "free riders", and did not add significantly to the burden on free speech that is inherent in any agency shop. *Id.* 111 S.Ct. at 1959.[2]

Plaintiffs argue that the assessments fail because they are not germane to collective bargaining, are not justified to avoid a free rider problem, and significantly burden free speech. However, by arguing that the assessments are not germane to collective bargaining, the plaintiffs seem to be limiting the scope of that prong to encompass only collective bargaining in their bargaining unit. The court, recognizing that the nature of an affiliation relationship often requires a pooling of resources, has rejected the notion that nonunion members can

only be required to pay for benefits that directly accrue to their bargaining unit. *Lehnert,* 111 S.Ct. at 1952 ("a local bargaining representative may charge objecting employees for their pro rata share of the costs associated with otherwise chargeable activities of its state and national affiliates, even if those activities were not performed for the direct benefit of the objecting employees bargaining unit"). *See also Pilots Against Illegal Dues v. Air Lines Pilots Association,* 938 F.2d 1123, 1128 (10th Cir.1991) (ALPA properly charged the plaintiffs' for negotiating and administrative expenses incurred outside of the United bargaining unit); *Crawford v. Airline Pilots Association, International,* 870 F.2d 155 (4th Cir.1989), *reh'g en banc granted,* (reasonable for ALPA to divide costs of negotiating among all of its constituents).

The defendant also has moved for summary judgment on this issue. The thrust of ALPA's argument is that the facts surrounding the strike against Eastern Air Lines indicate that the assessment against the Pan Am pilots was germane to collective bargaining and that the assessment was necessary to reduce the risk of free riders. Essentially, ALPA argues that Frank Lorenzo had established a pattern of behavior when he took over Continental Airlines in 1983, and that the events at Eastern were patterned after that behavior. ALPA believed that Mr. Lorenzo repudiated the collective bargaining agreements held by ALPA, IAM, and other unions at Continental, reduced the employees wages by approximately 50 percent, and eventually managed to eliminate the major unions at that air line. At Eastern, Mr. Lorenzo had begun pressing for wage and benefit reductions and tried to repudiate the pilots' collective bargaining agreement. ALPA determined that Mr. Lorenzo presented a threat to the job security of Eastern pilots by transferring work and assets from Eastern to nonunion Continental. Also, the

---

**2.** Plaintiffs argue that the proper test is that proposed by the dissenters in Lehnert. That test is that "contributions can be compelled only for costs of performing the union's statutory duties as exclusive bargaining agent." *Id.* 110 S.Ct. at 1975. However, unless and until Lehnert is overturned, the Court will continue to apply the test dictated by the Court in that case.

Eastern pilots recognized that their success in bargaining was closely tied to the success of other unions, and especially to IAM, the largest Eastern union.

ALPA maintains that the actions taken by Mr. Lorenzo at Eastern threatened the ability of the pilots at Pan Am to bargain effectively because if Mr. Lorenzo were able to cut wages and eliminate the unions at Eastern, that would put additional pressure on other carriers to reduce their labor costs. ALPA points to the fact that the majority of the pilots voted on three separate occasions by secret mail in ballot to support the sympathy strike and the special strike assessment as evidence that they recognized the critical connection between Mr. Lorenzo's efforts at Eastern and the ability of the ALPA to have continued success in negotiations for the pilots at Pan Am.

This issue has been addressed in part by at least two Circuits. In *Crawford,* a panel of the Fourth Circuit affirmed a lower court ruling that ALPA did not have to rebate to the nonunion pilots the portion of the agency shop fees that ALPA spent supporting strikes at airlines that did not employ the objecting pilots. *Crawford v. Air Line Pilots Association, International,* 870 F.2d 155 (4th Cir.1981), *reh'g en banc granted.* The Fourth Circuit held that the expenditures were germane to the union's objectives as the exclusive bargaining representative because what the union was trying to accomplish was to benefit all pilots, not just those in the bargaining unit at United. *See also Pilots Against Illegal Dues v. Air Line Pilots Association,* 938 F.2d 1123 (10th Cir.1991).

On the question of whether the Eastern strike assessments were properly chargeable to dissenting bargaining unit members, the *Lehnert,* decision mandates a ruling in favor of ALPA. 111 S.Ct. 1950. The plaintiffs in *Lehnert* argued that a union

> may not utilize dissenters' [agency shop] fees for activities that, though closely related to collective bargaining generally, are not undertaken directly on behalf

of the bargaining unit to which the objecting employees belong.

*Id.* at 1959. The Court rejected this contention, stating

> [w]hile we consistently have looked to whether nonideological expenses are "germane to collective bargaining," we have never interpreted that test to require a direct relationship between the expense at issue and some tangible benefit to the dissenters' bargaining unit.... [A] local bargaining representative may charge objecting employees for their pro rata share of the costs associated with otherwise chargeable activities of its state and national affiliates, even if those activities were not performed for the direct benefit of the objecting employee's bargaining unit.

*Id.* at 1961. ALPA's position, that it was only a matter of time before the efforts of Mr. Lorenzo against the machinists was brought to bear against the pilots as well, is plausible. As the Court stated,

> a local bargaining representative may charge objecting employees for their pro rata share of the costs associated with otherwise chargeable activities of its state and national affiliates, even if those activities were not performed for the direct benefit of the objecting employee's bargaining unit.

*Id.* at 1952. Here, the strike by the Eastern pilots, although a sympathy strike, was part of ALPA's bargaining strategy at Eastern. ALPA made a determination that the success of IAM, the largest Eastern union, directly impacted on the success of ALPA in its collective bargaining efforts at Eastern. ALPA determined that the Eastern strike assessment was needed to create a pool of resources, much like that discussed in *Lehnert,* that was available to carry on collective bargaining activities of the affiliates.

Although it is a difficult legal question, the Court is convinced that assessments to support a sympathy strike waged by other pilots in the same union, although in a different bargaining unit, are germane to collective bargaining under the *Lehnert* test. Also, the Pan Am pilots may in fact

have been "free riders" if the sympathy strike by the Eastern pilots had worked and ALPA had consequently become stronger and more influential in its negotiations with Pan Am.

There can be no doubt that requiring the nonunion pilots in the Pan Am bargaining unit to support financially a strike by Eastern pilots in sympathy for the machinists at Eastern does significantly burden free speech. The plaintiffs argue that

> requiring the nonunion pilots of one airline, upon pain of discharge, to support ALPA's political statement against Frank Lorenzo and Eastern Air Lines significantly burdens and infringes upon the nonunion pilots' freedom of speech!

However, under the test articulated by the majority in *Lehnert v. Ferris Faculty Association,* the question is whether that burden is significantly greater than the burden already associated with an agency shop provision. Under that test, the Court finds that the burden upon free speech is not significantly greater.

The plaintiffs also argue that even if the assessments for the Eastern sympathy strike are chargeable to nonunion members of the bargaining unit in the abstract, they cannot be charged here because ALPA failed to provide the procedural safeguards required by the Court in *Chicago Teachers' Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). In *Hudson,* the Court held

> that the constitutional requirements for the Unions's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.

*Id.* at 310, 106 S.Ct. at 1078.

However, ALPA provided adequate information about the assessments. ALPA announced the assessment in its magazine, Air Line Pilot, that goes to agency-fee payers as well as members. That announcement indicated the amount of the assessment as well as its purpose. Additionally, the bills that each pilot received monthly listed an "Eastern assessment," and listed a telephone number that the pilots could call if they had any questions. Additionally, in June 1989, every pilot paying agency fees received a copy of ALPA's Policies and Procedures Applicable to Agency Fees that explained the procedure for objecting to the use of their agency fees for nongermane purposes. The pilots had knowledge of both the amount of the assessments and the purpose for collecting the assessment.

### CONCLUSION

Accordingly, for all of the foregoing reasons, the Court shall grant the defendant's motion for summary judgment and shall deny the plaintiffs' motion for summary judgment.